[No. E005891. Fourth Dist., Div. Two. Feb. 22, 1990.]

VICKI L. DANIELEY et al., Plaintiffs and Appellants, v.
GOLDMINE SKI ASSOCIATES, Inc., Defendant and Respondent.

**COUNSEL**

Robert F. Wilson for Plaintiffs and Appellants.

Hancock, Rothert & Bunshoft, Paul D. Nelson and Peter J. Koenig for Defendant and Respondent.

**OPINION**

**McDANIEL, J.**—The appeal here is from a summary judgment entered in favor of defendant Goldmine Ski Associates, Inc. (Goldmine), in an action arising from serious personal injuries suffered by plaintiff Vicki L. Danieley when she collided with a tree while skiing on lands in the San Bernardino Mountains, operated by Goldmine as a ski area. In the first count of the complaint Goldmine was charged with negligence in the operation and maintenance of the premises, which included the ski run next to which plaintiff Vicki L. Danieley was injured. More specifically, the complaint

alleged that Goldmine had failed "to remove an obstacle [a tree immediately adjacent to the ski run] which presented an unreasonably high risk of harm . . . ." The second count, in which Charlie Danieley joined as a plaintiff, alleged a loss of consortium with his wife.

The trial court granted Goldmine's motion for summary judgment for the reason, as stated in the minute order, that "no facts alleged re establishing duty on the part of Defendant to remove obstacles." In our view, the trial court correctly ruled on the motion, and so we shall affirm the judgment.

## EVENTS LEADING TO THE LITIGATION

In February of 1987, plaintiffs, husband and wife, along with their two sons, including Charlie Danieley III, traveled to the Goldmine Ski Area, adjoining Big Bear Lake in the San Bernardino Mountains, for a day of skiing. After lunch, while descending a ski run, bearing the name "Upper Claim Jumper" and designated as an "intermediate" run, plaintiff wife lost control of her skis while attempting to turn, and then, while out of control, collided with a large tree just beyond the groomed edge of the run.

Plaintiff wife sustained serious injuries as a result of the collision, and swift action by the ski patrol in removing her from the mountain probably saved her life. This litigation followed.

## SYNOPSIS OF TRIAL COURT PROCEEDINGS

As above noted, plaintiffs' two-count complaint included a garden-variety premises liability claim based on defendant ski area operator's alleged negligence, plus plaintiff husband's claim for loss of consortium. Goldmine's answer denied any responsibility for plaintiff wife's injuries and alleged four affirmative defenses, including that plaintiff wife had "assumed any and all of the risks . . . referred to in said Complaint, and therefore, assumed the risk of any injuries or damages sustained, if any."

Extensive discovery ensued, including depositions of both plaintiffs and son Charlie III, plus those of two Goldmine employees, Marshall D. Boswell, Jr., and Joseph A. Shuff.

Goldmine then noticed a motion for summary judgment, and papers filed in support of the motion included excerpts of certain of the depositions noted, authenticated by the declaration of one of Goldmine's attorneys. Plaintiffs' opposition filings included additional, authenticated deposition excerpts.

Distilling the contents of the deposition excerpts on which it relied, Goldmine prepared and filed a statement of undisputed facts as here recited, with the deposition citations omitted.

"1.   VICKI DANIELEY was an intermediate skier who had skied approximately 15 to 20 days between 1985 and February 1987. She considered herself competent to ski 'advanced' runs.

"2.   VICKI DANIELEY before had fallen while skiing and understood that falling was part of the sport. She understood that if she fell, she could be injured.

"3.   VICKI DANIELEY knew that ski runs were lined with trees. She knew that it was possible to lose control of her skis and strike such a tree, causing serious injuries.

"4.   As a skier, VICKI DANIELEY was willing to assume these risks of injury in order to participate in the sport of skiing.

"5.   VICKI DANIELEY knew that snow surface conditions can vary, and understood that she was free to ski down any run, essentially in any fashion she wanted. She previously had skied under conditions where she had to watch out for obstacles.

"6.   Upper Claim Jumper is an intermediate rated ski run at Goldmine. Skiing conditions on the date of the injury were typical 'spring' conditions with soft snow and some hardpacked/icy areas.

"7.   VICKI DANIELEY visited GOLDMINE with her family on February 3, 1987. She previously had skied at GOLDMINE on two or three occasions. She already had skied down Upper Claim Jumper once on the run immediately before her injury. She has no recollection of the day's events.

"8.   VICKI DANIELEY had traversed across Upper Claim Jumper when she lost control of her skis while attempting a left turn, and then impacted a tree situated along the edge of the run. She was approximately 25 to 35 feet from the tree when she lost control and veered downhill into it. The tree was situated off the snow covered groomed portion of the run. There were no unusual obstacles found in the snow at the scene of the accident. There was no observable ice on the run in the area where she lost control."

Plaintiffs, in opposing the motion, of course insisted that there were triable issues of fact. Included as part of their memorandum of points and authorities, plaintiffs recited what they perceived to be triable issues of fact

as follows: "(1) whether the failure to remove or guard against a tree which is within or adjacent to a ski run, and which tree is located less than 100 feet from the top of chairlift number 1 and within clear view of the unloading station manned and controlled by defendant's employees, and this area of the ski run (which was designed, maintained and controlled by defendants and its employees) is commonly used by skiers to make one of their first downhill turns, constitutes a breach of duty to permissive users of the property; (2) whether the failure to remove or guard against the above-described tree, violates any applicable standard of care; (3) whether the presence of such a tree, in this particular location, is a dangerous condition which constitutes an unreasonable risk of harm to foreseeable use of the property; (4) whether defendant acted negligently in attending to plaintiff's injuries based upon defective equipment and/or improper medical treatment; ([5]) whether defendant was negligent in failing to conduct any line of sight or other proof testing to assure that hazards within or adjacent to the ski run are removed; (6) whether defendant was negligent in failing to maintain proper maintenance, repair and/or inspection programs; and (7) whether defendant was negligent in the use, application and grooming of 'man made' snow in the area of plaintiff's accident."

Otherwise plaintiffs, in a separate filing, submitted a catalog of *disputed* facts, each supported by citations to portions of the several depositions noted. Such statement, without the deposition citations, reads:

"1.   Ski Patrol employed by Goldmine were negligent in the care and treatment of plaintiff, Vicki Danieley, in that they were unable to get an oxygen tank to operate and a neck brace could not be used because it was broken.

"2.   The ski run where plaintiff's accident occurred was *groomed to the subject tree.* [Original italics.]

"3.   An artificial snow making machine was located adjacent to the subject tree, which was used to spray 'man made' snow in and around the tree.

"4.   Defendant represented in its telephone message that skiing conditions were good to excellent, and conditions were very patchy with bare spots and rocks.

"5.   The accident occurred less than 100 feet from the unloading station at the top of chair number 1. Defendant contends the accident occurred more than 150 *yards* from the top of chair number 1. [Original italics.]

"6. Even though plaintiff, Vicki Danieley, was not travelling very fast and the snow was soft and wet, plaintiff travelled 25 to 35 feet before striking the tree.

"7. Plaintiff never considered the risk of skiing into a tree before this accident.

"8. Plaintiff was unaware of the 'warning language' contained on defendant's lift ticket.

"9. Defendant Goldmine designed and maintained the ski run known as Upper Claim Jumper by (1) application of artificial snow; (2) daily grooming of the runs by both heavy equipment and ski patrol; (3) removal of rocks, trees, branches or other hazardous material; (4) clearing runs in the summer by rolling rocks and 'mulching', to wit, breaking apart and spreading around bales of hay to make the run smooth; and (5) continuous maintenance of the run by ski patrol and other employees.

"10. Defendant Goldmine can remove trees, subject to U.S. Forest Service approval, as it deems appropriate.

"11. Defendant failed to remove, or protect against, a large tree upon or adjacent to Upper Claim Jumper, and which was less than 100 feet from the top of chairlift number 1 and within view of the unloading station."

After considering the written filings and listening to oral argument, the trial court granted the motion, doing so from the bench. As indicated earlier, the minute order recited the reason for the ruling to be that no facts had been shown such as would establish any duty devolving on Goldmine to remove the tree with which plaintiff wife collided. Judgment was later entered on the order granting the motion, and this appeal followed.

## DISCUSSION

By their notice of appeal dated August 30, 1988, plaintiffs have purported to appeal from a judgment of July 1, 1988. The latter date is the one on which the motion for summary judgment was granted, and so plaintiffs have undertaken to appeal from a nonappealable order. Judgment was actually entered on August 22, 1988, before plaintiffs' notice of appeal was filed, and so we shall deem the appeal to have been taken from that judgment.

Turning to the appeal itself, plaintiffs' assignments of error, though seven points are urged, really amount to only three. First, plaintiffs argue that the

trial court erred in concluding that there were no triable issues of fact raised by the opposition filings. Second, plaintiffs in substance argue, on the key legal issue, the presence of duty, that the trial court erred in determining that the facts did not impose a duty on Goldmine to have the fateful tree removed. Finally, relying on section 437c, subdivision (h) of the Code of Civil Procedure, plaintiffs argue that the trial court erred in not granting them a continuance, to enable further discovery.

In reviewing the propriety of granting a motion for summary judgment, the applicable guidelines are well established and frequently stated. In *Golden West Broadcasters, Inc.* v. *Superior Court* (1981) 114 Cal.App.3d 947 [171 Cal.Rptr. 95], we said, "In approaching such a decision the trial court is guided by well settled and clearly defined rules. ■ 'Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue.' [Citing *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].]" (*Id.,* at p. 954.)

In other words, as to the first requirement to be met by the moving party, only if it can be determined that the moving party's declaration, " 'considered in light of the issues raised by the pleadings . . . would, standing alone[,] support summary judgment[,] does the court look to any counter-affidavits and counterdeclarations.' " (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [177 Cal.Rptr. 445], quoting from *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127 [109 Cal.Rptr. 724].)

Once the court has considered the filings before it and found that there are no triable issues of fact presented by such filings, determination of the motion for summary judgment then becomes a determination of an issue of law which the court must make. (*Shields* v. *County of San Diego* (1984) 155 Cal.App.3d 103, 108 [202 Cal.Rptr. 30].)

In short, as observed by the court in *Reid* v. *State Farm Mut. Auto Ins. Co.* (1985) 173 Cal.App.3d 557 [218 Cal.Rptr. 913], ". . . an issue which is abstractly one of fact may be resolved by summary judgment if the moving party's declarations fully establish the claim or defense and his opponent's declarations fail to rebut it. [Citation.] To put the matter otherwise, the issue of fact becomes one 'of law' and loses its 'triable' character if the undisputed facts leave no room for a reasonable difference of opinion." (*Id.,* at pp. 570-571.)

■ Whenever a court must rule on a motion for summary judgment, the factual issue guidelines for such motion are fixed by reference solely to the pleadings. In the case here, as earlier noted, plaintiffs sought relief on two counts, the first under a premises liability theory[1] and the second under a loss of consortium theory, the viability of which, of course, depended on the success of the first. In count one, the actual charging allegations, which operated to frame the factual issue(s) to be resolved, plaintiffs alleged that the "accident was caused by the negligence of [Goldmine] . . . in failing to maintain, manage and/or control the premises, to wit, the failure to warn of dangerous snow conditions and/or failure to remove [the tree] which presented an unreasonably high risk of harm to skiers in the area."

With reference to the alleged failure to warn of "dangerous snow conditions," as it turned out, this was not an issue of fact urged by plaintiffs in opposing the motion. Among their papers filed in opposition, plaintiffs stated that "It should be observed that although the snow conditions may or may not have contributed to plaintiff's fall, the texture or quality of the snow, by itself, is not considered a significant factor."

Similarly, at argument of the motion, the court asked counsel for plaintiffs, "[w]hat dangerous condition caused [plaintiff wife] to lose control? Skiers lose control regularly. [¶] Without knowledge of the course, what facts do you have that show that [plaintiff wife] lost control because of some dangerous conditions?" To this counsel replied, "[w]e don't know what caused her to fall. It isn't necessarily our contention that a condition of the hill did cause her fall. It is more likely the case that she lost control. [¶] What created the dangerous condition here is that once she did lose control, she slid 30 or 35 feet directly in line to this tree."

In view of these representations by plaintiffs' counsel, both written and oral, it is beyond question that the ultimate factual issue raised by the first count was limited to whether Goldmine was negligent in failing to remove the tree with which plaintiff wife collided.

Parenthetically, despite the limited charging allegations of the initial pleadings as here recounted, plaintiffs, both in their filings in opposition and at oral argument to the trial court, attempted to inject a further factual issue, namely whether Goldmine and its ski patrolmen had been negligent in caring for plaintiff wife *after the collision.* Because there was no such allegation in the complaint, this effort proceeded either out of ineptness or

---

[1] Plaintiffs utilized a printed form complaint approved by the Judicial Council of California, and page 4 of the form used was inscribed at the top in bold-faced type, "Cause of Action—Premises Liability."

guile. Either way, it was a wholly specious gambit, and the trial court properly ignored it.

Accordingly, to reiterate, based on plaintiffs' own complaint, the only possible factual issue addressed by the motion for summary judgment was whether Goldmine had been negligent in failing to remove the tree with which plaintiff wife collided.

I

## GOLDMINE'S PRIMA FACIE SHOWING

Goldmine, apparently out of an abundance of caution, submitted a tabulation of eight paragraphs of undisputed facts, *ante*. However, in our view, paragraph 8 would have been sufficient. The evidentiary basis for paragraph 8 is the deposition testimony of Charlie III, the only eye witness to what happened. Plaintiff wife has no recollection of anything which occurred after the family had lunch.

According to Charlie III's deposition, after leaving the lift at the top of the run, he and his parents commenced skiing down Upper Claim Jumper. He stated at his deposition that in skiing that run earlier they had observed that there were more rocks on the margins of the run, i.e., near the trees and that the snow was better in the center of the run. Charlie III was behind his mother; he testified, "she was turning normally. She was doing it really good. And then when she turned for the last time, she just—she looked like she just lost all control . . . ." Paraphrasing his further testimony, plaintiff wife had traversed the run to the left, made a right turn and was traversing to the right. Then, on the right side of the run, she attempted to make a left turn to traverse back to the left. At that point, according to Charlie III's testimony, "She just lost control while she was trying to turn, but I don't know what it was that made her lose control." At this point, according to Charlie III's estimate, plaintiff wife was 25 to 35 feet from the tree. From that point she skied straight into the tree, colliding with it while standing straight up. With reference to the condition of the surface where plaintiff wife lost control, Charlie III was asked "When you made a reference . . . to an icy part, did you actually see any ice where she lost control?" He answered, "No, I didn't. It just looked like she hit an icy part and lost control."

With reference to the foregoing factual showing, Goldmine contends, as a matter of law, that its duty of care as operator of a ski area, arising under

section 1714 of the Civil Code[2] and under *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], "does not extend to protecting skiers from being injured through the inherent, obvious, and unavoidable risks of participating in the sport, including particularly a skier's impacting obvious, avoidable natural obstacles such as trees solely as a result of the skier's losing control of her movements on a ski run through no fault of the ski area [operator]." This contention imports the legal issue resolved by the trial court in Goldmine's favor, namely whether its duty of care to plaintiffs extended to removal of the tree.

To impose a duty of the kind urged by plaintiffs would, in our view, have the effect of making Goldmine an insurer of plaintiff wife's safety, as well as an insurer of the safety of every other skier on the mountain.

■ As stated in *Brown* v. *San Francisco Baseball Club* (1950) 99 Cal.App.2d 484 [222 P.2d 19], ". . . the owner of property, insofar as an invitee is concerned, is not an insurer of safety but must use reasonable care to keep his premises in a reasonably safe condition and give warning of latent or concealed perils." (*Id.*, at p. 486.)

Pursuing our analysis toward the more specific, because the possessor or operator of a given premises is not an insurer of the safety of invitees onto his premises, he is entitled to assume that any such invitee will perceive that which should be obvious to him in the ordinary use of his senses. In *Haberlin* v. *Peninsula Celebration Assn.* (1957) 156 Cal.App.2d 404 [319 P.2d 418], the court said that defendant operator of the carnival premises "was not required to warn plaintiff [invitee] of obvious dangers, as defendant was entitled to assume that plaintiff would perceive the obvious by use of his senses." (*Id.*, at p. 408.)

Also illustrative is *Delk* v. *Mobilhomes, Inc.* (1953) 118 Cal.App.2d 529 [258 P.2d 75], in which the plaintiff workman, while moving a prefabricated house, sustained injuries when a jack slipped as a result of its sinking into moist ground. By directed verdict, the court denied recovery against the defendant landowner. It reasoned that the moist condition of the ground was obvious, so the hazard presented thereby was not "unreasonable." It held that the defendant owed the plaintiff no duty to warn him or otherwise protect him from the hazard.

---

[2] In pertinent part, section 1714 reads, "(a) Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the Title on Compensatory Relief."

Witkin puts the matter more succinctly when he writes, ". . . if the danger is *so obvious* that a person could reasonably be expected to see it, *the condition itself serves as a warning,* and the landowner is under no further duty unless harm was foreseeable despite the obvious nature of the danger." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 930, p. 301, original italics, citing, among others, *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 661 [136 Cal.Rptr. 203].)

■■■ With these principles of general application in mind, we turn now to the precise factual scenario presented by this record, i.e., a circumstance where a skier (business invitee) lost control of her skis and collided with a tree. As an a priori matter, it is evident to us that a large tree growing at the edge of a ski run signals an obvious danger, and that its very presence, in Witkin's words, "itself serves as a warning." Consequently, as an original proposition, we would conclude that Goldmine was under no duty to warn that this particular tree, among the hundreds that border the several ski runs at Goldmine, presented a danger to plaintiff wife. The tree itself provided a warning to plaintiff of the implicit danger of a collision with it. A fortiori, Goldmine was under no duty to remove it. One could ask, if there were a duty to remove trees along the edges of ski runs, "which trees?" Such a solution, if followed to its logical conclusion, as noted in Goldmine's brief, would finally lead to cutting down every tree on the mountain.

Our a priori position notwithstanding, what do the authorities say? The only California case cited to us (and we could find no others) which deals with this subject generally is *McDaniel* v. *Dowell* (1962) 210 Cal.App.2d 26 [26 Cal.Rptr. 140]. In that case, plaintiff was injured when another skier ran into her. In the litigation that followed, a jury ruled against plaintiff's claim against the ski area operator for her injuries. Because of the nature of the proceedings, i.e., because the case was resolved on issues of fact, it does not represent a clear-cut holding that there was no duty to warn of the danger from other skiers while using the rope tow. On appeal, the judgment was affirmed, and the court, in commenting on the evidence, said ". . . it was clear from the evidence that one of the risks normally incident to the use of the skiing facilities was the danger arising from the movements of a skier who has lost control of his bodily actions." (*Id.,* at p. 36.)

A note in the Annotation (1987) 55 A.L.R.4th 632 collects the cases as of 1987 with issues arising from injuries to skiers allegedly caused by conditions on the slopes. In the note's summary and comment, the editors say, ". . . courts have found that the hazards presented by the presence of a tree stump . . . or of metal poles . . . used for ski lift supports, snowmaking, or other utilities are obvious, necessary, or inherent in the sport and [such hazards] are thus assumed by skiers." (*Id.,* at p. 635.)

Several of the states, where skiing is a significant part of the winter scene, have enacted statutes which, in considerable detail, fix the respective responsibilities of both skiers and ski area operators. Michigan is one such state, and *Schmitz* v. *Cannonsburg Skiing Corp.* (1988) 170 Mich.App. 692 [428 N.W.2d 742], a 1988 Michigan case, resolved the dispute between a skier's survivors and the operator, arising from a skier's death following his collision with a tree, much the same as happened in the case here. The Michigan case is also highly instructive, because in the trial court it was disposed of by summary judgment in defendant operator's favor, and so the legal issue there was exactly the same as presented here, namely whether there was a duty to remove the tree.

Although the case was decided in light of the Michigan Ski Area Safety Act, the plaintiff there conceded and the reviewing court agreed that the "language of the Ski Area Safety Act *sets up a scheme of codified negligence using the common-law standards of reasonable behavior under the circumstances.*" (*Schmitz* v. *Cannonsburg Skiing Corp., supra*, 428 N.W.2d 742, 743, italics added.) Thus, because the Michigan Ski Area Safety Act purports to reflect the preexisting common law, we regard its statutory pronouncements as persuasive authority for what the common law in this subject-matter area should be in California.

Once such pronouncement reads, "Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment." (Mich. Stat. Ann. § 18.483 (22)(2).)

In the course of the *Schmitz* opinion, the court relied upon an earlier Michigan case, *Grieb* v. *Alpine Valley Ski Area, Inc.* (1986) 155 Mich.App. 484 [400 N.W. 2d 653], quoting therefrom, " 'The Legislature perceived a problem with respect to the inherent dangers of skiing and the need for promoting safety, coupled with the uncertain and potentially enormous ski area operators' liability. Given these competing interests, the Legislature decided to establish rules in order to regulate the ski operators and to set out ski operators' and skiers' responsibilities in the area of safety. MCL 408.340 *et seq.*; MSA 18.483(20) *et seq.* As part of this reform, the Legislature has decided that all skiers assume the obvious and necessary dangers of skiing. This is a rational solution for limiting ski area operators' liability and

promoting safety." (*Schmitz* v. *Cannonsburg Skiing Corp.*, *supra*, 428 N.W.2d 742, 743.)

Later in the opinion, the court quoted the Senate Analysis prepared at the time the legislation was enacted. That analysis reads, " 'By clearly defining the extent to which skiers and ski area operators are liable for damages and injuries sustained in skiing accidents, the bill would help reduce the number of lawsuits in which skiers recover large sums of money for injuries that are primarily their own fault. This, in turn, should stabilize the constantly increasing insurance costs for ski area operators, which have been passed on to skiing enthusiasts through price hikes for ski lift tickets, rental equipment, waxing services, etc.' " (*Schmitz* v. *Cannonsburg Skiing Corp.*, *supra*, 428 N.W.2d 742, 744.)

In its concluding comments which resulted in affirming the summary judgment in favor of defendant ski area operator, the *Schmitz* court said, ". . . it is clear from the plain and unambiguous wording of § 22(2) [*ante*] that the Legislature intended to place the burden of certain risks or dangers on skiers, rather than ski resort operators. Significantly, the list of 'obvious and necessary' risks assumed by a skier under the statute involves those things resulting from natural phenomena, such as snow conditions or the terrain itself; natural obstacles, such as trees and rocks; and types of equipment that are inherent parts of a ski area, such as lift towers and other such structures of snow-making or grooming equipment when properly marked. These are all conditions that are inherent to the sport of skiing. . . . The skier must accept these dangers as a matter of law." (428 N.W.2d at p. 744.)

Based on the underlying rationale in *Schmitz*, evolved under a statute derived from the common law, it is our view that Goldmine was able to demonstrate to the trial court that it was under no duty to remove the tree with which plaintiff wife collided.

Plaintiffs here, in addressing the legal issues as they had defined them, argued in their opening brief that the trial court "improperly relied upon the doctrine of assumption of the risk . . ." and contended that they are "not barred from recovery under assumption of the risk where the risk encountered was not the risk assumed." Neither of these propositions even remotely entered into the trial court's formulation of its ruling and hence neither has any relevance in aid of resolving this appeal.

At this point, we must also take issue with plaintiffs' characterization of the factual predicate on which they based their legal argument on the issue of duty. After stating that "it might be conceded that a collision with another skier falls within the scope of the hazards of the sport . . . ,"

plaintiffs then state, "[h]owever, where the skier is forced into a tree as the result of a hidden path created by the defendant, such conduct goes beyond the plaintiff's contemplation of the risks assumed." This position, as stated in their brief, reflects a statement in plaintiffs' papers, filed in opposition to the motion, that ". . . the gist of plaintiff's theory [is] that the design, grooming and maintenance (or lack of proper maintenance) created a hidden trap for anyone falling near the tree." There was no testimony or other evidence before the trial court about any hidden trap or path. Moreover, as recounted above, when the court, at argument of the motion, questioned counsel directly on what caused plaintiff wife to lose control, he answered that he did not know and then stated that "[w]hat created the dangerous condition here is that once she did lose control she slid 30 or 35 feet directly in line to this tree." We cannot avoid here observing, had there been any evidence in the record to substantiate the theory that some sort of path had forced plaintiff into the tree, that plaintiffs' counsel would surely have alluded to it then and there. He did not, and our line-by-line review of the deposition excerpts before the trial court failed to reveal any such evidence. Actually, in plaintiff husband's deposition, at the point where the questioning had brought the story up to the point where he had come to the aid of his wife at the fateful tree, he was asked, "Did you see anything in the snow out of the ordinary on the run in the vicinity of where she was laying [*sic*]?" Plaintiff husband answered, "No, sir."

Thus, despite plaintiffs' efforts to expand the factual predicate against which the presence or absence of Goldmine's duty is to be measured, the record shows conclusively that such predicate amounts only to the eyewitness testimony of Charlie III, *ante*. Therefore, we reiterate our holding that the trial court correctly ruled that Goldmine was under no duty to remove the tree.

One further comment on this point is in order, and we shall defer to the note writer in 8 Hastings Law Journal 335 (1957). The note there dealt with a common type of premises liability, i.e., that where plaintiff slips and falls on a wet floor in a retail store. Even in such cases as these, the note writer points out that there are limits, and it is the duty of the courts to recognize those limits when the danger is obvious. For this proposition, the note writer invoked *J. C. Penney Co., Inc.* v. *Robison* (1934) 128 Ohio St. 626 [193 N.E. 401, 100 A.L.R. 705] where the Ohio court said, "under our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the rights of citizens where no question for the jury is involved, as it is to deny to a citizen his trial by jury when he has the right." (193 N.E. at p. 404.) The evident evil in the former pronouncement is precisely what the trial court's ruling in favor of Goldmine operated to avoid in the case here.

## II

### PLAINTIFFS' ATTEMPT TO RAISE TRIABLE ISSUES OF FACT

Another of plaintiffs' three underlying assignments of error was that the court had improperly granted the motion for summary judgment, because, by their filings, they had succeeded in raising triable issues of fact. ■ The framework of the inquiry into this contention is well settled, as set forth in *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 953], where the court said, " 'The matter to be determined by the trial court in considering such motion is whether the defendant (or the plaintiff) has presented facts which give rise to a triable issue. The court may not pass on the issue itself . . . [citing, among others, *Stationers Corp.* v. *Dun & Bradstreet, Inc.,* 62 Cal.2d 412, 417].' " (*Id.*, at pp. 851-852.)

■ In discussing Goldmine's prima facie showing under point I of this opinion, we have taken the position that the legal issue of duty could be resolved solely by reference to the facts as related by Charlie III in his eye-witness testimony.

However, to provide thoroughness to our inquiry into the existence of possible issues of fact, we have included plaintiffs' tabulation of the supposed triable issues of fact and their separate statement of disputed facts, *ante*. With reference to the former tabulation, the first six items are all variously related but clearly peripheral to the legal determination which must be made with reference to the bare bones, eyewitness account as testified to by Charlie III. Number seven of the tabulation is outside the determinative issue raised by the first count of plaintiffs' complaint. Turning to plaintiffs' statement of 11 paragraphs of disputed facts, none of them is of any ultimate significance in measuring the presence or absence of negligence in failing to remove the tree. Stated otherwise, if the first 10 were determined in plaintiffs' favor, so to speak, to be undisputed, such determinations would be meaningless in aid of the decisional task presented by this record. Number 11 in essence is a legal conclusion, which assumes the issue, i.e., if there was no duty to "protect against" the tree with which plaintiff collided, then to characterize not doing so as a "failure" is meaningless.

In resolving the issue here, it is perhaps enough to observe that plaintiffs' mere tabulation of seven issues of fact in its points and authorities was not responsive to the requirements prescribed by the statute and the authorities, i.e., to present evidence in counter-declarations which contradicts that in the supporting declarations. As for plaintiffs' statement of disputed facts, which is supported by deposition references, none of those deposition refer-

ences contradict the eyewitness account provided by Charlie III. Otherwise, one could query, as to each of the 11 assertions, "So what?" In other words, the hard reality, which plaintiffs cannot avoid, is that none of these so-called disputed facts have any significant relevance to the decisional task of measuring Goldmine's duty to remove the tree.

While both sides have undertaken to extend the factual predicate, necessary to determine the motion, to matters beyond Charlie III's eyewitness account, we are persuaded that such account is the factual crux of the case. This undisputed evidence is all that was needed to enable the court to rule on the motion, and so conducting a trial would add nothing which would change the outcome. Hence, because there were no disputed issues of material extrinsic fact, there is no need for a trial.

### III

### The Denial of Plaintiffs' Motion for a Continuance

Plaintiffs' final assignment of error is that the court improperly denied their motion for a continuance of hearing of the motion for summary judgment. In making this contention, plaintiffs invoke section 437c, subdivision (h) of the Code of Civil Procedure,[3] which affords a party opposing a motion for summary judgment opportunity to seek a continuance of hearing the motion to enable additional discovery, provided certain conditions recited in the statute are met.

In arguing this point in their brief plaintiffs state, "Plaintiffs originally filed an At-Issue Memorandum on August 13, 1987 due at least in part to financial concerns arising out of plaintiff's medical expenses (totalling over $120,000.00). Plaintiffs anticipated conducting further discovery until the normal discovery cut-off, however, plaintiff's condition deteriorated some time in December of 1987 when her memory level and overall functioning ability suffered a serious reversal, and plaintiff was rehospitalized. Plaintiff's counsel thus struck the At-Issue Memorandum and took the matter off calendar." After then citing various authorities bearing generally on the subject, plaintiffs argue further in their brief that counsel did not have adequate opportunity to conduct discovery. The complaint was filed June 8, 1987, and answered July 17, 1987. The motion for summary judgment was

---

[3] Subdivision (h) reads, "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just."

noticed April 11, 1988, and argued May 23, 1988. Previously, in February, both sides had taken the depositions we have earlier noted.

■ Turning to the record with reference to the requirements contained in subdivision (h), there is nothing in plaintiffs' opposition filings which provided the predicate for granting a continuance. If a continuance is to be granted, the circumstance that "facts essential to justify opposition may exist but cannot, for reasons stated, then be presented" (Code Civ. Proc. § 437c, subd. (h)) must be contained in affidavits filed in opposition. No such affidavits or declarations were filed by plaintiffs, and a review of the reporter's transcript of the argument of the motion clearly shows that the trial court had none of the matters before it as above quoted from plaintiffs' brief.

Even so, the record also shows that the trial court afforded plaintiffs' counsel a fair opportunity to make out a case for continuance. He wholly failed to do so.

Moreover, there was an intriguing disclosure by plaintiffs' counsel during the argument of the motion. Plaintiffs' counsel argued that plaintiffs needed the continuance to enable their expert to look at the ground and to get a "slope reading"; that this would involve considerable expense, and, before the expert was retained, that he, the attorney, wanted to "see what the outcome was" on defendant's motion for summary judgment. However, in previously discussing the supposed dangerous location of the tree with which plaintiff wife collided, plaintiffs' counsel had stated, "and my clients have—for the record, we have a factual dispute as to which tree is involved." Accordingly, if plaintiffs and their attorney could not agree which tree was involved, the trial court correctly concluded and we agree that there was no need to obtain an expert to assess the slope leading to a tree of undetermined location.

Otherwise, as to plaintiffs' counsel's excuse about the expense involved in retaining the expert, the court stated, "But in this case, you didn't want to go to the expense of the discovery to determine there was a dangerous condition until you knew whether or not we were going to grant or deny the motion. I understand the economics of it.

"But on that basis all summary judgments should be thrown out on the theory 'We aren't going to do discovery until the motion has been denied.' "

The issue here is controlled by our discussion in *Hartenstein* v. *Superior Court* (1987) 196 Cal.App.3d 206 [241 Cal.Rptr. 756]. In *Hartenstein,* an original proceeding in which petitioner sought a writ of mandate to set aside

an order granting a motion for summary adjudication of certain issues, one of the grounds for the petition was that petitioners had been denied a continuance under section 437c, subdivision (h) to conduct further gathering of evidence. In resolving this issue against petitioner, we said, "Hartenstein did not show, in his opposition papers, either that the evidence was 'essential to justify opposition' or that he could not have obtained it in the period of over two years between the filing of his second amended complaint and the filing of Blue Cross's motion for summary adjudication." (*Id.*, at p. 221.)

So it is here. Although the interval of counsel's procrastination was shorter here, the principle involved is exactly the same. We cannot say that the trial court abused its discretion in denying the motion for a continuance. (*Fisher* v. *Larsen* (1982) 138 Cal.App.3d 627, 648 [188 Cal.Rptr. 216].)

DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and Dabney, J., concurred.