[No. C016042. Third Dist. Sept. 23, 1994.]

JEFFERY WATTENBARGER et al., Plaintiffs and Appellants, v. CINCINNATI REDS, INC., et al., Defendants and Respondents.

748

---

**COUNSEL**

Roddick, Mulligan & Hernandez, Mulligan & Hernandez, Michael M. Hernandez and Darcel M. Mulligan for Plaintiffs and Appellants.

Glahn & Hirschfield and Darrell Glahn for Defendants and Respondents.

## OPINION

**PUGLIA, P. J.**—Plaintiffs appeal from a judgment of dismissal following an order granting defendants' motion for summary judgment. Plaintiffs seek damages for an arm injury suffered by plaintiff Wattenbarger during a major league baseball tryout conducted by defendants. The trial court concluded plaintiffs' claim is barred by the doctrine of assumption of risk. We shall reverse.

### I

Defendant Cincinnati Reds, Inc. (Reds) owns and operates a major league baseball team. Defendant Jeffrey Zimmerman is the Reds' Central and Northern California supervisor of scouting.

On June 28, 1990, Zimmerman supervised a "tryout" for the Reds in Lodi, California, in which players aged 16 to 21 were invited to participate. Plaintiff Jeffery Wattenbarger, who at the time was 17 years old, read a notice of the tryout in a local newspaper and attended.[1] Having pitched for his high school baseball team the last two seasons, plaintiff wanted to become a pitcher for the Reds.

Upon his arrival at the tryout, plaintiff signed a waiver of liability form which included a space for the signature of a parent or guardian. Plaintiff's mother was not present and did not sign the form. Plaintiff was nevertheless permitted to participate.

After the participants signed in, they were given an orientation talk explaining the procedures for the day. During this talk, the participants were asked if they had any injuries and pitchers were asked when they had last thrown. Injured players were not permitted to participate fully in the tryout.

After the orientation, participants were timed in a 60-yard dash. Balls were then hit to infielders and outfielders at their respective positions and they fielded them and made throws. All of this was observed by the Reds' representatives in attendance who would, on occasion, provide advice to individual players on proper techniques.

---

[1] The other plaintiff in this action is Wattenbarger's mother, Bonnie Moran. Moran's claims are essentially derivative in nature. "Plaintiff" hereafter refers to Wattenbarger alone. "Plaintiffs" refers to both Wattenbarger and Moran.

The last part of the tryout was conducted under conditions simulating an actual game. The pitchers, including plaintiff, each took a turn throwing to several batters. Before his turn, plaintiff threw a number of warmup pitches to get his arm ready. On his third pitch to a batter, plaintiff felt his arm "pop" but experienced no particular pain. He stepped off the pitcher's mound and informed the Reds' personnel, including Zimmerman, that his arm had popped. Receiving no response, plaintiff returned to the mound and threw another pitch.[2] He immediately experienced severe pain in his arm and quit pitching.

A subsequent medical examination revealed a portion of the bone and tendons in plaintiff's arm had been pulled away due to the force of contraction of his tricep muscle during pitching.

Plaintiffs initiated this action against the Reds and Zimmerman claiming negligence in permitting plaintiff to throw a fourth pitch after they knew or should have known this would cause severe injury. Defendants moved for summary judgment claiming, inter alia, plaintiff's injury is one inherent in the sport of baseball and hence they owed him no duty of care. The trial court granted the motion and entered a judgment of dismissal.

## II

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. . . . To succeed, the defendant must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46], citations omitted.)

The pleadings identify the issues to be considered on a motion for summary judgment. (*Sadlier* v. *Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) The defendant must present facts to negate each claim as framed by the complaint or to establish a defense. Only then must the plaintiff demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

The complaint states a cause of action for negligence. Plaintiffs allege defendants "negligently allowed [plaintiff] to continue to pitch when they

---

[2]Whether or not the Reds' representatives responded to plaintiff's statement is a matter of dispute, which will be discussed *post*. It is undisputed, however, that plaintiff heard no response.

knew or ought to have knowwn [*sic*] that to continue would cause irreparable harm."

According to the complaint, such conduct "was the proximate cause of the injuries and damages alleged."[3]

■ The essential elements of a cause of action in negligence are: "(a) a *legal duty* to use due care; (b) a *breach* of such legal duty; [and] (c) the breach as a *proximate or legal cause* of the resulting injury." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, pp. 60-61 and cases cited therein, italics in original.) As a practical matter, these elements are interrelated, as the question whether an act or omission will be considered a breach of duty or a proximate cause of injury necessarily depends upon the scope of the duty imposed. (See generally, Hart & Honoré, Causation in the Law (2d ed. 1985) p. 94.)

■ In their motion for summary judgment, defendants argued the type of injury suffered by plaintiff is a risk inherent in the game of baseball and plaintiff assumed such a risk when he voluntarily participated in the tryout.

■ In two companion cases, *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] (*Ford*), the Supreme Court explained assumption of risk is of two types, primary and secondary. Secondary assumption of risk is the traditional variety where a defendant breaches a duty of care owed to the plaintiff but the plaintiff nevertheless knowingly encounters the risk created by the breach. Secondary assumption of risk is not a bar to recovery, but requires the application of comparative fault principles. (*Knight*, at pp. 314-315.)

Primary assumption of risk occurs where a plaintiff voluntarily participates in a sporting event or activity involving certain inherent risks. For example, an errantly thrown ball in baseball or a carelessly extended elbow in basketball are considered inherent risks of those respective sports. (*Knight*, *supra*, 3 Cal.4th at p. 316.) Primary assumption of risk is a complete bar to recovery. (*Id.* at pp. 314-315.)

Primary assumption of risk is merely another way of saying no duty of care is owed as to risks inherent in a given sport or activity. The overriding

---

[3]The complaint also alleges defendants breached a special duty owed by defendants as "adults" to plaintiff, a "minor." However, nowhere is it alleged how this duty arose in the absence of a special relationship between the adult and the minor (such as parent-child or teacher-student). At any rate, the relative age of the parties merely goes to whether a general duty should be recognized in connection with this incident. This issue is subsumed within the general negligence claim.

consideration in the application of this principle is to avoid imposing a duty which might chill vigorous participation in the sport and thereby alter its fundamental nature. (*Knight, supra*, 3 Cal.4th at pp. 318-319.)

For example, in *Knight* the defendant, a participant in a touch football game, knocked over the plaintiff, another participant, and then stepped on her hand and injured it. (3 Cal.4th at p. 300.) The court held the defendant owed no duty to the plaintiff under these circumstances: "[I]n the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. . . . [E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight*, at pp. 318-319, italics in original.)

In *Ford*, the court held the driver of a boat towing a water-skier owed no duty to the skier who was injured when his head struck a limb extending over the water. In rejecting the plaintiff's argument that the rule announced in *Knight* should not apply to a noncompetitive, cooperative sport such as water-skiing, the court explained: "Even when a water-skier is not involved in a 'competitive' event, the skier has undertaken vigorous athletic activity, and the ski boat driver operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the active conduct of the sport. Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports." (*Ford, supra*, 3 Cal.4th at p. 345.)

In both *Knight* and *Ford*, the court held negligent conduct of a participant in an active sport is an inherent part of the game. Certain sports have inherent risks which do not involve the want of ordinary care by other participants. Skydiving is an obvious example. In snow skiing, the risk of falling on steep slopes or uneven terrain is an inherent part of the sport. " 'Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly

marked or plainly visible snow-making or snow-grooming equipment.'" (*Danieley* v. *Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 123 [266 Cal.Rptr. 749], quoting from Mich. Stat. Ann., § 18.483(22)(2).)

■ There can be little question an arm injury such as that suffered by plaintiff is a risk inherent in the sport of baseball. Plaintiff was a pitcher. In baseball, the objective of a pitcher is to keep batters from reaching base. To do this, pitchers must be able to throw the ball with such accuracy and velocity and along such trajectories as will tend to inhibit batters from hitting it, or at least from hitting it safely. (See generally, The Oxford Companion to World Sports and Games (Ox.U. Press 1975) p. 57.) This activity naturally causes great strain on the pitching arm. The injury suffered by plaintiff, tearing away of bone and tendon due to tricep contraction, was a direct result of the natural strain caused by the pitching motion of the arm.

Had plaintiff stopped after his third pitch of the simulated game, we would have no difficulty finding primary assumption of risk a bar to recovery. Up to that point, defendants did nothing more than provide an opportunity for plaintiff to do what he had been doing for the last two years i.e., to pitch. Whatever injury occurred on the third pitch was an inherent risk of the pitcher's unremitting contest with the batter.

However, the incident did not end with the third pitch. Viewed in the light most favorable to plaintiffs, the evidence establishes defendants initially directed plaintiff to pitch and then permitted him to continue after he informed them his arm had "popped."[4] It is reasonable to infer that when plaintiff, a 17-year-old, informed the Reds' personnel his arm had "popped," he was seeking guidance as to how to proceed. Hearing nothing to countermand the original instruction to pitch, and obviously anxious to please and

---

[4]Plaintiffs contend defendants verbally directed plaintiff to throw another pitch. They base this contention on the testimony of Brian Valtierra, another tryout participant who was standing nearby awaiting his turn to bat.

Defendants argue Valtierra's testimony is inherently improbable in that it conflicts with that of several other witnesses including plaintiff himself, the description of events given by Valtierra is inconsistent with other testimony, and there is some suggestion Valtierra's testimony was influenced by statements made to him by plaintiff during a conversation years after the incident.

We need not resolve defendants' challenge to the Valtierra testimony. Liability for negligence requires that defendants' conduct be an actual and proximate cause of the injuries. The only claimed basis for holding defendants liable for plaintiff's injury is their instruction to him, either expressly or as implied by their silence, to throw another pitch. Defendants' conduct could be considered an actual cause of plaintiff's injury only to the extent it caused him to resume pitching. If plaintiff did not hear defendants, any statement they may have made could not have caused him to proceed to throw a fourth pitch. Hence, Valtierra's testimony as to what defendants said is irrelevant in the summary judgment proceedings.

impress the scouts, plaintiff threw another pitch, thereby causing further injury.[5]

As the court in *Knight* explained: "[T]he scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." (*Knight, supra*, 3 Cal.4th at p. 317.) Moreover, "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant." (*Knight, supra*, 3 Cal.4th at pp. 315-316.)

In *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270], an experienced rider was injured when she fell from a horse during training. She sued her instructor and the owner of the stables for negligence claiming they caused her to jump over fences which were unreasonably and unnecessarily high and improperly designed, located, and spaced. The Court of Appeal reversed summary judgment for the defendants. While recognizing the risk of injury from a fall cannot be eliminated "and in fact creates the challenge which defines the sport," i.e., is an inherent part of the sport, the court concluded these defendants owed a duty "to avoid an unreasonable risk of injury to plaintiff and to take care that the jumping array was not beyond the capability of horse and rider." (*Galardi, supra*, 16 Cal.App.4th at p. 823.)

Like the defendant in *Galardi* v. *Seahorse Riding Club, supra*, defendants were not coparticipants in the sport or activity but were instead in control of it.[6] Defendants decided what would be done and when. They controlled the simulated game in the sense of determining who would play

---

[5] Defendants contend plaintiffs failed to present evidence that further injury was caused by the fourth pitch. The only expert medical testimony presented was that of Dr. Randall Williams, who operated on plaintiff's arm after the incident. Dr. Williams testified in deposition that he could not determine whether the fourth pitch caused further injury.

Defendants are confused on the applicable burden of proof. To be entitled to summary judgment, defendants must negate an essential element of the cause of action. In order to negate causation, the burden was on defendants to demonstrate there is no factual issue regarding causation. They failed to do so.

[6] Defendants' argument they were participants in the tryout because both player and observer are integral parts of a tryout is in error. Under the reasoning of *Knight*, participants are limited to those actively engaged in the game or other activity.

what positions, including pitcher, and for how long. They supplied necessary equipment, such as bats and batting helmets, and took it upon themselves to restrict the participation of players with injuries. They also gave a limited amount of instruction on techniques.

Under these circumstances, defendants owed a duty to plaintiff and the other participants not to increase the risks inherent in the game of baseball. Thus, for example, they owed a duty not to supply faulty equipment such as batting helmets or catching gear.

 Whether this general duty of care also extends to restricting participation by an injured player to avoid aggravation of an injury is primarily a question of foreseeability. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572-573 [224 Cal.Rptr. 664, 715 P.2d 624]; *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) "As a classic opinion states: 'The risk reasonably to be perceived defines the duty to be obeyed.' (*Palsgraf* v. *Long Island R.R. Co.* (1928) 248 N.Y. 339, 344 [162 N.E. 99, 59 A.L.R. 253].) Defendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance. [Citations.]" (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 739.)

 Other considerations relevant to the duty issue include "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 124-125 [211 Cal.Rptr. 356, 695 P.2d 653].)

 It requires no depth of analysis to recognize when one injures himself, further use of the injured member will likely exacerbate the condition. This is especially pertinent where, as here, the further use is in connection with a tryout for a professional sports team. It cannot be lost on defendants that the tryouts they conduct are the only opportunity for many boys and young men to demonstrate they have the potential to play major league baseball, and perhaps to command the astronomical salaries and enjoy the universal celebrity that are identified with the sport. Under such circumstances, it is not at all unforeseeable a participant will attempt to push his body beyond its capabilities.

In addition to the foreseeability of harm, various policy considerations support imposition of a duty here. While we attach no moral blame to defendants' conduct, it is nevertheless true the tryout was conducted for their benefit. Defendants' objective was to discover talented players who could improve the Reds' future prospects even more and add ever more luster to the most venerable of all baseball franchises, one which already occupies legendary status in the annals of American sports. Imposition of a duty to protect participants from aggravating an existing injury would help to prevent future harm. At the same time, such a duty would not unduly burden either defendants or injured players. Neither is served by permitting a player to participate in a tryout where such participation is necessarily constricted by an injury. Finally, evidence was presented that the Reds were not only able to but did in fact maintain insurance for tryout injuries.

For the foregoing reasons, we conclude defendants owed a duty of care to protect participants from aggravating injuries during the tryout. This would include preexisting injuries known to defendants as well as those occurring during the tryout. Thus, primary assumption of risk is inapplicable.

Because issues of fact exist as to whether defendants were aware of plaintiff's injury, whether they encouraged or permitted him to throw a fourth pitch, and whether this final pitch caused injury, summary judgment was improperly granted.[7]

The judgment is reversed and the matter remanded to the trial court to vacate its order granting defendants' motion for summary judgment and to enter an order denying the motion. Plaintiffs are to recover costs on appeal.

Scotland, J., and Nicholson, J., concurred.

---

[7]Regarding Moran's argument in the plaintiffs' opening brief that she was misled into providing plaintiff with medical care by the promise defendants would pay for it, the complaint contains no such allegations. In a summary judgment motion, the issues are defined by the pleadings. (*Sadlier* v. *Superior Court*, *supra*, 184 Cal.App.3d at p. 1055.) Defendants were not required to negate a claim not alleged, and we therefore give the argument no further consideration.