[No. G021475. Fourth Dist., Div. Three. Nov. 23, 1998.]

JOHN M. VAN DYKE, Plaintiff and Appellant, v.
S.K.I. LTD. et al., Defendants and Respondents.

## COUNSEL

Herbert Hafif, Wayne J. Austero and Patricia M. Lytle for Plaintiff and Appellant.

Hancock, Rothert & Bunshoft, Paul S. Rosenlund, David J. Potkul and Marci D. Friedman, Murchison & Cumming and Edmund G. Farrell III for Defendants and Respondents.

## OPINION

**WALLIN, Acting P. J.**—John M. Van Dyke appeals the judgment entered against him after the trial court granted summary judgment in favor of S.K.I. Ltd. and Killington West Ltd. (collectively Bear Mountain)[1] and denied his motion for summary adjudication. He contends he showed triable issues of facts as to assumption of risk and S.K.I. Ltd.'s owner/operator status at the ski area where he was injured. We reverse with directions.

---

[1]All parties apparently agree Bear Mountain Ltd. was an owner and operator of the Bear Mountain Ski Resort on the day Van Dyke was injured and that Bear Mountain Ltd. changed its name to Killington West Ltd. when the resort was sold later. Van Dyke claims S.K.I. was also an owner and operator when the accident occurred. Conversely, S.K.I. contends it merely owned all of Bear Mountain/Killington's stock and played no role in the ownership or operation of the ski area. We reject below S.K.I.'s claim there was no triable issue of fact concerning its contention, but we refer to the defendants as Bear Mountain for simplicity's sake, except where the context requires otherwise.

On his first trip to the Bear Mountain Ski Resort, Van Dyke skied with three friends.[2] He was an experienced skier, having skied about 25 to 35 times in the preceding 5 years. He rated himself as an upper intermediate to lower advanced skier. He understood skiing involved risk, that it was not injury free. He knew a skier must ski under control, which means being able to stop before coming into contact with hazards one can see.

The four men began skiing about 10:30 a.m. The weather was warm, sunny and clear. Their first run of the day was down the "Showtime" run, which is accessed by chair lift No. 1. Showtime is a "most difficult" run, designed for advanced skiers. The run was open and clear, with few other skiers and no moguls.[3]

Just before their second run, which was also down Showtime, Van Dyke's party decided they would ski over to chair lift No. 2 for their third run. Van Dyke skied down the left hand side of Showtime, as he had on his first run. When he reached a point near the crossover trail to chairlift No. 2, he cut across the face of Showtime at about a 90-degree angle. As he approached the right side of the run traveling at about 15 miles per hour, he saw a black foam rubber object about 15 to 20 feet away. He tried to ski around it, but due to the "hard pack" snow conditions, his speed, and his distance from the object, he struck it, fracturing his spine and rendering him a paraplegic.

The object was a signpost for a sign that showed the direction to chair lift No. 2 and, ironically, bore the admonition, "Be AWARE [—] SKI WITH CARE." The black wrapping around the sign blended in with the lift tower, shadows, and trees in the background. Van Dyke could not see the face of the sign because he approached it at about a 90-degree angle. None of Van Dyke's ski companions saw the sign. Indeed, two of them missed the crossover trail.

The steel signpost Van Dyke struck was about three inches in diameter and was wrapped with a black cylinder. The cylinders are hollow and made of foam rubber. They are designed with the idea several of them will be placed around fixed objects that can be injurious to skiers upon impact. The hollow cylinders can absorb the force of the impact as they compress. Rather than place a number of the cylinders around the signpost, Bear Mountain slit one cylinder down the side and wrapped it around the post. In doing so, Bear

---

[2]Because this appeal is from a grant of summary judgment, we state the facts and draw the inferences most favorable to Van Dyke, the party against whom the trial court granted judgment. (*Heredia* v. *Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1353-1354 [279 Cal.Rptr. 511].)

[3]Moguls are bumps or small hills in a ski run which are created by snow that piles up as skiers carve turns down and across the run. They make skiing more difficult.

Mountain eliminated the hollow center of the cylinder, depriving it of its ability to absorb the impact.

Van Dyke sued Bear Mountain for negligence and premises liability based on the location of the sign, the condition of the ice, and the improper use of the risk management cylinder.[4] Killington sought summary judgment on the ground Van Dyke was barred by primary assumption of the risk. S.K.I. joined Killington's motion and brought its own motion for summary judgment on the ground it was merely a passive shareholder in Bear Mountain when Van Dyke was injured. Van Dyke brought a countermotion for summary adjudication, seeking a determination Bear Mountain owed him five distinct duties of care. The trial court granted Killington's and S.K.I.'s motions and denied Van Dyke's.

In ruling on the motions, the trial court found primary assumption of the risk as to the signpost,[5] and that S.K.I. was also entitled to summary judgment on the ground it was a mere passive shareholder in Bear Mountain when the accident occurred. Van Dyke's motion for summary adjudication was denied as moot or alternatively on the ground Bear Mountain owed him no duty of care regarding the signpost.

I

Van Dyke contends the trial court erroneously granted Bear Mountain's motion for summary judgment on the ground he was barred by primary assumption of the risk. "A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) . . . For purposes of a summary judgment motion, '[a] defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be

---

[4]Van Dyke also sued the manufacturer of the cylinder, but settled that part of the action while this appeal was pending.

[5]The court reasoned, "[S]ummary judgment is proper because the post was open and unobstructed . . . and that the plaintiff's accident was a risk of the sport, and there was no duty or breach thereof. The risk of hitting something like this, whether it's a signpost or a pole supporting a ski lift or snow making equipment or trees, is a risk of injury that's inherent in the sport and is a primary assumption of the risk of the sport of skiing with which the plaintiff was quite familiar. [¶] Evidence that plaintiff *himself* may not have seen the subject signpost, or arguments that the signpost may have in some way 'blended' into the background or not made [*sic*] as visible as it conceivably could have been, are not admissible to defeat the fact that: (1) the post was open and unobstructed, and thus presented its warning, and (2) the risk of impacting a fixed object on a ski run is a risk inherent in the sport of skiing. Defendant's objections to plaintiff's evidence as to the above are thus SUSTAINED."

established . . . .' (Code Civ. Proc., § 437c, subd. (o)(2).)" (*Connelly* v. *Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 10 [45 Cal.Rptr.2d 855].)

■ " 'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] [¶] In *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], the Supreme Court discussed the difference between 'primary' and 'secondary' assumption of risk. ■ Primary assumption of risk is a policy-driven legal concept where the courts declare there is no duty at all. [Citation.] '[The] defendant owes no duty to protect the plaintiff from a particular risk of harm . . . .' [Citation.] [¶] Primary assumption of risk has often been imposed where the plaintiff and defendant are engaged in a sport. 'In the sports setting . . . conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself.' [Citation.] To decide whether a duty will be imposed on a participant in a sporting activity, the court must determine whether the injury suffered arises from an inherent risk in the activity, and whether imposing a duty ' "might chill vigorous participation in the implicated activity and thereby alter its fundamental nature. [Citation.]" ' [Citation.] Determination of what constitutes an 'inherent risk' is a legal question for the court. [Citation.]" (*Mosca* v. *Lichtenwalter* (1997) 58 Cal.App.4th 551, 553 [68 Cal.Rptr.2d 58].) We independently review the evidence to determine whether, under undisputed facts, primary assumption of risk bars Van Dyke from recovering damages.

■ Bear Mountain contends that as a matter of law the signpost was a risk inherent in skiing and vigorous participation in the sport would be chilled by imposing a duty of care regarding the sign, justifying the application of primary assumption of risk. Bear Mountain relies on skiing cases where the courts held assumption of the risk applied. But each of those cases either involved an injury caused by a natural feature of the terrain (*O'Donoghue* v. *Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188, 191 [35 Cal.Rptr.2d 467] [ravine bordering tree-lined ski run]; *Danieley* v. *Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 114 [266 Cal.Rptr. 749] [tree abutting ski run]) or a huge fabricated object plainly visible to skiers (*Connelly* v. *Mammoth Mountain Ski Area, supra,* 39 Cal.App.4th at p. 10 [ski lift tower in ski run plainly visible from 200 yards].).

*Danieley* v. *Goldmine Ski Associates, Inc., supra,* 218 Cal.App.3d 111 was the first California case to deal with assumption of risk when a skier collides

with a fixed object.[6] The discrete issue was whether the ski area operator's duty of care " 'extend[ed] to protecting skiers from being injured through the inherent, obvious, and unavoidable risks of participating in the sport, including particularly a skier's impacting *obvious*, avoidable *natural* obstacles such as trees solely as a result of the skier's losing control of her movements on a ski run through no fault of the ski area [operator].' " (*Id.* at p. 121, italics added.) The trial court found the ski area operator did not owe a duty to remove trees from the ski run area to protect skiers from injury if they were to lose control. (*Id.* at p. 122.)

In affirming that result, the *Danieley* court relied in part on the Michigan Ski Area Safety Act (Mich. Stat. Ann. § 18.483(22)(2)) which codified the common law and provides, in relevant part, " 'Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are *obvious and necessary*. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with *properly marked or plainly visible* snowmaking or snow-grooming equipment.' " (*Daniely v. Goldmine Ski Associates, Inc., supra,* 218 Cal.App.3d at p. 123, italics added.) The *Danieley* court also noted nothing in the evidence showed the ski area created a hidden trap that caused Danieley to strike the tree. (*Id.* at p. 125.)

From this language and the discrete issue presented, we may conclude the *Danieley* court did not purport to hold recovery for all skiing injuries is barred by assumption of the risk. Nothing in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] alters that conclusion. Indeed, the *Knight* court expressly recognized some ski related injuries are not barred by primary assumption of risk: "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm." (*Id.* at pp. 315-316.)

The other cases on which Bear Mountain relies recognized this limitation, at least implicitly. In *Connelly v. Mammoth Mountain Ski Area, supra,* 39 Cal.App.4th at pages 13-14, the court noted Connelly collided with a ski lift

---

[6]We have found no earlier cases and the *Danieley* court noted the only California skiing case cited to it involved a collision between two skiers. (218 Cal.App.3d at p. 122.)

tower which was visible from 200 yards and nothing indicated Mammoth Mountain did anything to increase the risk of harm. In *O'Donoghue* v. *Bear Mountain Ski Resort, supra,* 30 Cal.App.4th at pages 192-193, the court acknowledged Bear Mountain had a duty not to increase the risk of harm beyond that inherent in the sport, but observed that O'Donoghue injured himself by deliberately skiing off the marked run and into a ravine.

Van Dyke alleged, and presented evidence tending to show, Bear Mountain increased the risk of harm by placing a signpost in the ski run where it was virtually invisible to skiers crossing over to the connector trail to chair lift No. 2.[7] Unlike a ski lift tower which is wide and equally visible from all angles, the sign Van Dyke hit had about an eight-and-one-half-inch profile including the foam wrapping. Van Dyke's expert opined the black wrapping made the pole blend into the background. Van Dyke approached from the side as he crossed the run so he could not see the face of the sign. None of Van Dyke's skiing partners saw the sign, and he did not see it until it was too late to avoid the impact.[8] None of the cases on which Bear Mountain relies suggests this scenario is an inherent risk of skiing or that eliminating it would have an unduly chilling effect on the sport.

Bear Mountain stresses directional signs are necessary to a ski area. We do not suggest otherwise. When a ski area puts signs in a ski run, however, it has a duty to mark the signs so they are plainly visible from all angles to skiers who are skiing on the run. Otherwise, the ski area, by an affirmative act, significantly increases the risk of harm without enhancing the sport. Conversely, making the sign adequately visible has no deleterious effect on the sport.

Evidence in opposition to the motion for summary judgment, both from Van Dyke's expert and the manufacturer of the risk management cylinder, showed other ways directional signs can be made safer: (1) Locate the signs either on the uphill side of the run or off to the side where skiers are less likely to pass through on a steep decline; (2) attach the sign to the lift tower; (3) use a foam "breakaway" post instead of a wood or metal one; and (4) enhance visibility by affixing bright colors such as yellow, red or orange to

---

[7]As noted, we view the evidence in a light most favorable to Van Dyke.

[8]The trial court, in its ruling on the motion for summary judgment, sustained Bear Mountain's objection to evidence Van Dyke did not see the signpost and, purportedly, to arguments the signpost blended into the background. Although such evidence would be irrelevant in the absence of any duty of care (see *O'Donoghue* v. *Bear Mountain Ski Resort, supra,* 30 Cal.App.4th at p. 193), it was relevant to determine whether Bear Mountain unreasonably increased the risk of skiing by placing a fabricated object in the ski run where it was effectively invisible to skiers until it was too late to avoid it.

the post.[9] None of these measures would have the slightest detrimental effect on the sport.

The evidence was sufficient to overcome a finding Van Dyke was barred by primary assumption of the risk. Whether secondary assumption of the risk would bar any recovery is a question of fact reserved for trial. (*Knight* v. *Jewett, supra,* 3 Cal.4th at pp. 314-315.) The trial court should have denied Bear Mountain's motion for summary judgment.

## II

Van Dyke argues the trial court erroneously granted S.K.I.'s motion for summary judgment on the ground it was a mere passive shareholder in the Bear Mountain Ski Resort, and not an active owner/operator, when Van Dyke was injured. Although S.K.I. submitted the declaration of one of its principals averring it was merely a passive shareholder, it answered an interrogatory by saying it did business under the name Bear Mountain Ski Resort, and Van Dyke produced a news release in which S.K.I. indicated it was the owner/operator of the Bear Mountain Ski Resort. Although S.K.I. claimed the interrogatory was inadvertently answered incorrectly, and filed an amended answer, that action merely created an issue of fact to be resolved at trial. ■ S.K.I. also claims the press release was completely unauthenticated, but if it objected on this ground in the trial court, it failed to obtain a ruling on its objection, waiving the claim on appeal. (*People* v. *Morris* (1991) 53 Cal.3d 152, 195 [279 Cal.Rptr. 720, 807 P.2d 949] [objection waived by failure to obtain ruling in trial court].)

## III

Van Dyke claims the trial court erroneously denied his motion for summary adjudication. He asked the trial court to find Bear Mountain owed him five duties of care.[10] We decline to address this issue, except to the extent our holding that primary assumption of risk is inapplicable implies the existence of a duty not to increase the risks of injury beyond those inherent in skiing. (*Knight* v. *Jewett, supra,* 3 Cal.4th at pp. 315-316.)

---

[9]Bear Mountain correctly notes it need not take safety measures in the absence of duty. But we may properly note safety measures that do not affect the fundamental nature of the sport to determine whether primary assumption of the risk may be invoked.

[10]They are: (1) a duty not to increase the risks of injury over and above those inherent in skiing; (2) a duty to protect or warn Van Dyke against dangers that were not obvious and necessary; (3) a duty to correct dangers which in the exercise of reasonable prudence in the circumstances could have been foreseen and corrected; (4) a duty to protect Van Dyke from the risk of injury posed by the steel pipe because the risk of injury was known by the defendant; and (5) a duty to exercise ordinary and reasonable care because it voluntarily undertook to place a pad on the pipe.

Primarily, we decline to do so because the trial court never really heard argument or ruled on Van Dyke's motion, finding it either moot or conclusively resolved against him by the court's ruling on Bear Mountain's motion.[11] Its order did not discuss any of the theories of duty presented.[12] It was effectively a nonruling. ■ " 'In general, California courts have no power . . . to render advisory opinions or give declaratory relief.' [Citations.]" (*Municipal Court* v. *Superior Court* (*Gonzalez*) (1993) 5 Cal.4th 1126, 1132 [22 Cal.Rptr.2d 504, 857 P.2d 325].) We need not decide an issue in advance of a trial court ruling on it. (*Serafin* v. *First Interstate Bank* (1997) 58 Cal.App.4th 785, 796-797 [68 Cal.Rptr.2d 297].)

Because the trial court did not affirmatively rule on the motion for summary adjudication, we have no assistance as to whether the facts on which a determination of duty depends are undisputed. Previewing the voluminous documents in support of and in opposition to the motion is initially a task for the trial court.

The judgments granting summary judgment in favor of S.K.I. Ltd. and Killington West Ltd. are reversed. The trial court is directed to deny the defendants' motions for summary judgment and to hear and decide Van Dyke's motion for summary adjudication.

Crosby, J., and Bedsworth, J., concurred.

A petition for a rehearing was denied December 21, 1998, and respondents' petition for review by the Supreme Court was denied February 24, 1999.

---

[11]The failure to afford the parties a hearing presents an independent ground for reversal (*Mediterranean Construction Co.* v. *State Farm Fire & Casualty Co.* (1998) 66 Cal.App.4th 257, 262-265 [77 Cal.Rptr.2d 781]), but we do not rely on it because the parties did not raise or brief the issue. (Gov. Code, § 68081.)

[12]We do not suggest the court erred solely by failing to do so. Code of Civil Procedure section 437c, subdivision (g) requires a statement of triable issues of fact when a court denies a motion for summary *judgment* and a statement of reasons when the motion is granted. The subdivision does not purport to apply, however, to motions for summary adjudication. (But see *Bernstein* v. *Consolidated American Ins. Co.* (1995) 37 Cal.App.4th 763, 774 [43 Cal.Rptr.2d 817] [applying the subdivision to a failure to list triable issues of fact when denying a motion for summary adjudication].)