[No. C049329. Third Dist. Apr. 5, 2006.]

TATUM SOUZA, a Minor, etc., Plaintiff and Appellant, v.
SQUAW VALLEY SKI CORPORATION et al., Defendants and
Respondents.

COUNSEL

Bradley Paul Elley for Plaintiff and Appellant.

Hancock Rothert & Bunshoft, Duane Morris, John E. Fagan, Paul J. Killion, Jill Haley Penwarden and Michael L. Reitzell for Defendants and Respondents.

OPINION

**DAVIS, Acting P. J.**—In this negligence and strict products liability action, a child skier collided with a plainly visible aluminum snowmaking hydrant located on a ski run. The trial court granted summary judgment to the ski resort and the hydrant distributor, deeming the collision an inherent risk of skiing under the primary assumption of risk doctrine and finding no basis for the products liability claim. We affirm. The pertinent facts will be set forth in the discussion that follows.

DISCUSSION

1. *Standard of Review*

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) An appellate court determines on its own whether these criteria have been met. (*Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 844 [30 Cal.Rptr.2d 768].) For purposes of a summary judgment motion, '[a] defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established . . . .' (Code Civ. Proc., § 437c, [former] subd. (o)(2) [now subd. (p)(2)].)" (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 10 [45 Cal.Rptr.2d 855] (*Connelly*).)

2. *Background*

The summary judgment papers show the following undisputed facts.

On January 22, 2001, then eight-year-old plaintiff Tatum Souza (Souza), an intermediate skier, collided with a snowmaking hydrant on the Mountain Run ski trail at defendant Squaw Valley Ski Corporation's resort (Squaw Valley), injuring her mouth. The accident occurred when Souza caught her ski edge and lost her balance, causing her to veer to the right and collide with the hydrant.

The snowmaking hydrant that Souza collided with was "plainly visible." At the time of the collision, Souza was skiing with her family; the weather was overcast, the wind was calm, and the surface condition was packed powder. No one saw what part of the hydrant Souza hit; given her injuries, it appeared to be the nozzle.

Souza collided with the hydrant on her last run down the Mountain Run trail on January 22. She had skied this trail about 40 previous times, including once before in 2001.

The hydrant at issue was located 50 feet from the left side of the Mountain Run trail and approximately 27 feet to the left of a tree situated toward the right side of the trail; there is also room for skiers to go to the right of this tree on the trail. On the day of the accident, the hydrant protruded above the snow level about five to six feet. The hydrant was padded but its nozzle apparently was not.

Souza sued Squaw Valley for negligence and for willful failure to warn, alleging that the metal snow hydrant was inadequately padded and negligently located in a commonly congested area of the ski trail. Souza also sued Squaw Valley and defendant York Snow, Inc. (the seller-distributor of the hydrant), for strict products liability for a defective product—the defectively padded and placed snow hydrant and nozzle, pointed uphill.

### 3. *Negligence and Willful Failure to Warn*

#### a. *Negligence*

■ The doctrine of primary assumption of risk—a concept in negligence law—applies where a plaintiff voluntarily participates in an activity or sport involving certain inherent risks. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 314–316 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*); *Connelly, supra,* 39 Cal.App.4th at p. 11.) "For example, an errantly thrown ball in baseball or a carelessly extended elbow in basketball are considered inherent risks of those respective sports." (*Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751 [33 Cal.Rptr.2d 732] (*Wattenbarger*).) Under this doctrine, no duty of care is owed as to such risks. (*Knight, supra,* 3 Cal.4th at pp. 314–316; *Connelly, supra,* 39 Cal.App.4th at p. 11.) The rationale for the doctrine is to avoid imposing a duty which might chill vigorous participation in the sport and thereby alter its fundamental nature. (*Wattenbarger, supra,* 28 Cal.App.4th at pp. 751–752.) Because a duty of care is one of the elements of a negligence cause of action, if there is no such duty, there is no such action. (*Connelly, supra,* 39 Cal.App.4th at p. 11; see *Wattenbarger, supra,* 28 Cal.App.4th at p. 751.)

■ The issue of duty "in the primary assumption of risk context 'is a *legal* question which depends on the nature of the sport or activity . . . and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury.' " (*Connelly, supra,* 39 Cal.App.4th at pp. 11–12, quoting *Knight, supra,* 3 Cal.4th at p. 313.) In deciding whether or not to impose a duty, a court must consider the inherent risks of the sport and whether imposing a duty might alter that sport's fundamental nature. (*Van Dyke v. S.K.I. Ltd.* (1998) 67 Cal.App.4th 1310, 1315 [79 Cal.Rptr.2d 775] (*Van Dyke*).)

■ As we noted in *Connelly,* this court has listed the risks inherent in snow skiing on more than one occasion. " ' " 'Each person who participates in the sport of [snow] skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees and

other forms of natural growth or debris; *collisions* with ski lift towers and their components, with other skiers, or *with* properly marked or *plainly visible snow-making* or snow-grooming *equipment. (Danieley v. Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 123 [266 Cal.Rptr. 749] . . . , quoting from Mich. Stat. Ann., § 18.483 (22)(2).)' " ' [Fn. omitted.] (*Wattenbarger v. Cincinnati Reds, Inc., supra,* 28 Cal.App.4th at pp. 752–753 [38 Cal.Rptr.2d 65]; *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 253 [38 Cal.Rptr.2d 65], parallel citation omitted, italics added.)" (*Connelly, supra,* 39 Cal.App.4th at p. 12, italics omitted and second and third italics added.)

*Connelly* involved a skier's collision with a ski lift tower. In that decision, we affirmed a summary judgment for the ski resort—under the doctrine of primary assumption of risk—based on this inherent risk *Connelly* plows the course of our analysis here.

■ Similar to the plaintiff in *Connelly,* Souza indisputably collided with plainly visible snowmaking equipment while skiing. As noted, this risk is inherent in the sport. Consequently, the trial court properly granted summary judgment on this point, concluding that Squaw Valley, under the doctrine of primary assumption of risk, owed no duty to protect Souza against this inherent risk.

Also similar to the plaintiff in *Connelly,* Souza argues that Squaw Valley breached what has been recognized as a duty in this realm: the " 'duty to use due care *not to increase the risks* to a participant *over and above those inherent* in the sport.' " (*Connelly, supra,* 39 Cal.App.4th at p. 12, quoting *Knight, supra,* 3 Cal.4th at p. 316, italics added.) Squaw Valley breached this duty, Souza argues, by locating the snowmaking hydrant in the middle of a heavily congested, narrow ski run rather than on the side, by inadequately padding the hydrant and nozzle, and by concealing the nozzle and having it pointed uphill in the direction of oncoming skiers.

Although the snowmaking equipment was located on the ski run, no one has disputed there was sufficient room on either side of the equipment for skiers to pass by it. Although Souza claims the equipment was inadequately padded, we are not aware of any relevant legal authority, and we have not been directed to any, requiring a ski area operator to pad its plainly visible snowmaking equipment. (See *Connelly, supra,* 39 Cal.App.4th at pp. 12–13 [it would be anomalous to hold a ski operator more liable for inadequate padding if the operator cannot be held liable for failing to pad].) And although Souza claims there was concealed equipment here—the nozzle pointing uphill—the nozzle was a very small, integral part of the large, padded, aluminum snowmaking hydrant which was plainly visible to oncoming skiers. It remains

undisputed, then, that Souza collided with plainly visible snowmaking equipment (a padded, aluminum hydrant protruding about five to six feet above the snow level on the day of the accident). This is a risk that is inherent in the sport of snow skiing.

The undisputed plain visibility of the snowmaking hydrant distinguishes this case from one on which Souza heavily relies *Van Dyke*. In *Van Dyke*, the court reversed a summary judgment, finding a triable issue of fact as to whether the ski resort there had increased the risk of harm by placing a signpost in a ski run where it was "virtually invisible" to skiers crossing the run. (*Van Dyke, supra,* 67 Cal.App.4th at pp. 1317, 1318.) As *Van Dyke* remarked, "[The ski resort] stresses directional signs are necessary to a ski area. We do not suggest otherwise. When a ski area puts signs in a ski run, however, it has a duty to mark the signs so they are plainly visible from all angles to skiers who are skiing on the run. Otherwise, the ski area, by an affirmative act, significantly increases the risk of harm without enhancing the sport." (*Id.* at p. 1317.) *Van Dyke* additionally noted that signposts are not an inherent risk of skiing and could be rendered safer by locating them in safer areas or on lift towers, or by using "breakaway" posts instead of metal ones. (*Id.* at pp. 1315–1318.) Here, by contrast, the snowmaking hydrant was plainly visible, and a collision with such equipment has been legally deemed an inherent risk of skiing. (*Connelly, supra,* 39 Cal.App.4th at p. 12.)

Souza's argument regarding the duty not to increase the risks above those inherent in skiing focuses on the concept of what is "necessary" to the sport. As noted, pursuant to the doctrine of primary assumption of risk, " ' " '[e]ach person who participates in the sport of [snow] skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and *necessary.*' " ' " (*Connelly, supra,* 39 Cal.App.4th at p. 12, italics added.) The padded aluminum five-to-six-foot snowmaking hydrant here was plainly visible and therefore presented an "obvious" danger regarding collision. Souza maintains, however, that it was not "necessary" to locate the hydrant in the run, or to have the hydrant's nozzle pointed uphill.

We have two responses to this argument about what is "necessary." First, the snowmaking hydrant was necessary to the extent the sport of snow skiing, as its name implies, necessarily requires snow, and mother nature on the winter date of this accident—January 22, 2001—had not yet seen fit to drop enough flakes for an adequate cover. Viewed this way, snowmaking equipment is certainly more "necessary" for skiing than the directional signs acknowledged as "necessary" in *Van Dyke*. (*Van Dyke, supra,* 67 Cal.App.4th at p. 1317.) Imposing a duty for collisions with plainly visible and avoidable snowmaking equipment would alter the nature of snow skiing in a fashion similar to imposing a duty for collisions with lift towers: Skiing down a

mountain requires a lift on the way up and snow on the way down. As for the location and orientation of the snowmaking equipment, as we have noted, no one disputes there was sufficient room on either side of the hydrant for skiers generally to go by it. Souza did not crash into the snowmaking hydrant because of its unnecessary location or orientation, but because she caught a ski edge, lost her balance and veered into the plainly visible and generally avoidable structure.

Second, we considered and rejected in *Connelly* a similar argument about what is "necessary" by quoting from an out-of-state decision, *Verro v. New York Racing Ass'n, Inc.* (1989) 536 N.Y.S.2d 262 [142 A.D.2d 396] (*Verro*), a quote that is apt here. *Verro,* as quoted by *Connelly,* observed: " 'As is at least implicit in plaintiff's argument, . . . the doctrine of [primary] assumption of risk . . . would not apply to obvious, known conditions so long as a defendant could feasibly have provided safer conditions. Then, obviously, such risks would not be "necessary" or "inherent". This would effectively emasculate the doctrine, . . . changing the critical inquiry . . . to whether the defendant had a feasible means to remedy [the dangers].' " (*Connelly, supra,* 39 Cal.App.4th at p. 13, quoting *Verro, supra,* 142 A.D.2d at p. 400.)

Descending along a similar path, Souza points to the state Supreme Court's recent decision in *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*). *Kahn* reiterated the principle that determining the question of duty in the primary assumption of risk context depends not only on the nature of the sport but also on the parties' general relationship to it. (31 Cal.4th at p. 1004.) Discussing this "relationship" component of the duty issue, *Kahn* recognized that "[d]uties with respect to the same risk may vary according to the *role* played by particular defendants involved in the sport." (*Ibid.*) For example, said *Kahn,* while a baseball batter would not have a duty to avoid the inherent risk of carelessly throwing the bat after getting a hit, a stadium owner, with a different relationship to the sport, may have a duty to take reasonable measures to protect spectators from carelessly thrown bats. "For the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport." (*Ibid.*)

Based on *Kahn,* Souza argues that Squaw Valley, as "the owner or operator of a facility[,] has a duty to take reasonable steps to minimize risks without altering the nature of the sport, even if such risks are inherent in the sport." Phrased this way, Souza's argument would undermine the doctrine of primary assumption of risk—in the fashion noted *ante* in *Connelly*'s quote of *Verro*—by imposing a duty to minimize the inherent risks of a sport if dangers theoretically could be reduced. If this were the rule, " '[t]hen, obviously, such risks would not be . . . "inherent",' " and the primary

assumption of risk doctrine would be undermined because the critical inquiry would become whether the defendant had a feasible means to minimize the dangers. (*Connelly, supra,* 39 Cal.App.4th at p. 13, quoting *Verro, supra,* 142 A.D.2d at p. 400.) *Kahn* did not alter the doctrine of primary assumption of risk; *Kahn* reaffirmed it. (*Kahn, supra,* 31 Cal.4th at pp. 1003–1004.)

Souza's argument from *Kahn* does not fare any better when we move from the world of legal theory and logic to the practical world laid before us. The facility operator here—Squaw Valley—provided a place for snow skiers to ski. In that vein, Squaw Valley erected plainly visible and generally avoidable snowmaking equipment on a ski run. An inherent risk arose that a skier would run into such equipment *Kahn* does not impose a duty on Squaw Valley to minimize such an inherent risk, just as *Kahn* would not have imposed a duty on the stadium owner to have minimized the risk to the catcher from a carelessly thrown bat from the batter—that is an inherent risk of playing the game.

We conclude that summary judgment was properly granted on Souza's negligence cause of action.

b. *Willful Failure to Warn*

In her complaint, Souza also alleges—based on the same facts as her negligence count—that Squaw Valley willfully failed to warn or guard against the dangerous condition involving the snowmaking hydrant and nozzle. This count falls victim to summary judgment for three reasons.

First, as the trial court recognized, such willful misconduct embodies " ' " 'an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care.' " ' " (*New v. Consolidated Rock Products Co.* (1985) 171 Cal.App.3d 681, 689 [217 Cal.Rptr. 522] (*New*); see also *Delaney v. Baker* (1999) 20 Cal.4th 23, 31 [82 Cal.Rptr.2d 610, 971 P.2d 986].) Since Souza's cause of action for willful failure to warn is based simply on the allegations of ordinary negligence underlying her negligence cause of action, she has not alleged an aggravated form of negligence differing in kind rather than degree from ordinary lack of care. (See *Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 65 [15 Cal.Rptr.2d 598] [function of pleadings in a motion for summary judgment is to delimit scope of the issues].)

Second, Souza argues that *intentionally* locating an unnecessary hazard in a narrow, heavily traveled ski run constitutes willful misconduct. This argument pivots on the knowingly dangerous placement of an unnecessary hazard, the snowmaking hydrant. (See *New, supra,* 171 Cal.App.3d at p. 689 [willful

misconduct is intentional wrongful conduct done either with a knowledge of probable injury or with a reckless disregard].) But as we have seen in the previous section of this opinion, the hydrant was indisputably obvious, avoidable (generally) and necessary.

Finally, because of the obvious danger, the very existence of a large metal plainly-visible snowmaking hydrant serves as its own warning. (See *Connelly, supra,* 39 Cal.App.4th at p. 12.) Nothing was hidden from Souza's vision by accident or design. (*Id.* at p. 13.)

### 4. *Strict Products Liability*

Souza's final cause of action alleges that the snowmaking equipment—the hydrant and nozzle—was defective under the strict products liability doctrine because of its defectively designed location, padding and uphill direction.

■ Under this doctrine, a manufacturer or other relevant entity in the stream of commerce is strictly liable in tort when a product it places on the market, "knowing that [the product] *is to be used* without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897], italics added; accord, *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 249–252 [85 Cal.Rptr. 178, 466 P.2d 722].) The doctrine of primary assumption of risk does not insulate product suppliers from liability for injury for providing defective products. (*Bunch v. Hoffinger Industries, Inc.* (2004) 123 Cal.App.4th 1278, 1300 [20 Cal.Rptr.3d 780].)

The problem for Souza on this cause of action is that she neither used the hydrant and nozzle, nor was she a bystander to its use. (See *Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 586–587 [75 Cal.Rptr. 652, 451 P.2d 84].) Souza simply ran into the product, injuring herself. It is undisputed that the hydrant/nozzle was functioning properly as snowmaking equipment, and was not being used as a product at the time Souza crashed into it. As the trial court aptly put it, a plainly visible and generally avoidable snowmaking hydrant is not made defective simply because a skier runs into it.

Souza counters that the snowmaking equipment was defectively designed given the hydrant's location in the middle of the run and the nozzle's uphill direction. It is undisputed, though, that the hydrant was plainly visible, that there was sufficient room on either side of the snowmaking equipment for skiers to pass by, and that Souza simply caught a ski edge, lost her balance, veered toward the equipment and collided with it. As Squaw Valley persuasively argues, "[t]his scenario does not describe a product defect—it describes an inherent risk of skiing."

We conclude summary judgment was properly granted on this cause of action.

## DISPOSITION

The judgment is affirmed.

Robie, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied April 27, 2006.