Filed 12/24/24 Certified for Publication 1/10/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ALANA GEE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, <br><br> Defendant and Respondent. | B327691 <br><br> Los Angeles County <br> Super. Ct. No. 20STCV43627 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry Green, Judge. Affirmed.

Edelson, Todd Logan, Roger Perlstadt, Amy B. Hausmann and Hannah Hilligoss for Plaintiff and Appellant.

Bryan Cave Leighton Paisner, Christopher J. Schmidt, Jonathan B. Potts, Lauren G. Simon, Jean-Claude Andre, Matthew Stanford and K. Lee Marshall for Defendant and Respondent.

———————————————

This lawsuit arises from the 2018 death of Matthew Gee at the age of 49. Matthew Gee had played football for the University of Southern California (USC) from 1988 to 1992. In the fall of 1989, he was one of twelve linebackers on USC's depth chart. Matthew Gee was the fifth of those linebackers to die, all before age 50.[1] (Rosenberg, *USC's Dying Linebackers— Not So Much a Mystery* (Oct. 7, 2020) <https://www.si.com/college/2020/10/07/usc-and-its-dying-linebackers> [as of Dec. 23, 2024], archived at <https://perma.cc/KR3K-EQJT>.) The most famous of the five was Junior Seau, who played professional football for many years after graduating from USC and who committed suicide in 2012. The National Institutes of Health (NIH) later confirmed that Seau had Chronic Traumatic Encephalopathy (CTE), a neurodegenerative disease. (Breslow, *Junior Seau Suffered Chronic Brain Damage, NIH Study Finds* (Jan. 10, 2013) <https://www.pbs.org/wgbh/frontline/article/junior-seau-suffered-chronic-brain-damage-nih-study-finds/> [as of Dec. 23, 2024], archived at <https://perma.cc/7Y49-DLMB>.)

The coroner determined that Matthew Gee's death was due to the combined toxic effects of alcohol and cocaine, as well as hypertensive and atherosclerotic cardiovascular disease, anomalous small coronary arteries, complications of hepatic

---

[1] In deciding the question of duty under the assumption of risk doctrine, we may consider a wide variety of information and are not required to take judicial notice of such information. (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1158–1159 (*Nalwa*).) Although it is undisputed that these men died, we do not view their deaths as showing causation in this case. We note their deaths to provide background for our discussion of the state of college football.

cirrhosis, obstructive sleep apnea and obesity. Based in part on the deaths of other USC players and in part on changes in Matthew Gee's behavior before his death, his widow, Alana Gee, donated his brain to Boston University's CTE Center for study. Dr. Thor Stein examined Matthew Gee's brain and determined he had Stage II CTE, which is now referred to as low level CTE.

Alana Gee subsequently filed this wrongful death action against the National Collegiate Athletic Association (NCAA), contending that CTE was a substantial factor in her husband's death, and that the NCAA negligently failed to take reasonable steps which would have reduced his risk of contracting CTE. She chose not to name USC as a defendant. As relevant here, the NCAA asserted an assumption of the risk defense. It also argued that, as an unincorporated association, it could not be held liable for the failure of its members to vote to enact safety regulations. The jury's answers on the special verdict form dictated a judgment in favor of the NCAA.

Alana Gee appeals from that judgment, contending the trial court erred in finding that the assumption of risk doctrine applied and in refusing an instruction she proposed on the liability of an unincorporated association for the acts of its members. We find the assumption of risk doctrine does apply, and any instructional error relating to the NCAA's responsibility for the action or inaction of its members was harmless. We affirm the judgment.

## GENERAL BACKGROUND

Fundamentally, the assumption of the risk doctrine represents a judicial policy decision to encourage the continuation of dangerous activities by individuals who may have no idea of the risks they are taking. Although the phrase "assumption of

3

the risk" suggests that a participant is aware of the risks of injuries from a sport or recreational activity, and knowingly chooses to participate in it or opts not to participate based on his or her knowledge of those risks, this is not how the doctrine works. Application of the doctrine "does not depend on the particular plaintiff's subjective knowledge or appreciation of the potential risk. Even where the plaintiff, who falls while skiing over a mogul, is a total novice and lacks any knowledge of skiing whatsoever, the ski resort would not be liable for his or her injuries." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 316 (*Knight*).)

Rather than protecting the injured participant from the risks of a sport, the assumption of the risk doctrine absolves coparticipants, coaches and instructors, facilities owners/operators and event organizers from a duty of ordinary care toward the participant. Specifically, they have no duty to protect a participant from a risk which is "inherent" in the sport. (*Knight, supra*, 3 Cal.4th at pp. 315–316.) In effect, the doctrine protects these defendants from the consequences of their ordinary negligence with respect to those inherent risks.

This is consistent with the purpose of the doctrine, which is to protect the continued vitality of the sport. (*Nalwa, supra*, 55 Cal.4th at p. 1154.) The "primary assumption of risk doctrine rests on a straightforward policy foundation: the need to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities. It operates on the premise that imposing such a legal duty 'would work a basic alteration— or cause abandonment' of the activity. [Citations.] The doctrine's parameters should be drawn according to that goal." (*Nalwa,* at pp. 1156–1157.)

4

Historically, the NCAA was formed in response to an earlier crisis in football—increasingly numerous fatalities in college football, culminating in 18 deaths in 1905. The NCAA created rules for college football to curtail the number of fatalities and catastrophic injuries in the game. Consistent with its stated purpose of "formulat[ing], copyright[ing] and publish[ing] rules of play governing intercollegiate sports" the NCAA established rules committees for a number of sports, including football. The NCAA's bylaws state "it shall be the duty of the above committees to establish and maintain rules of play in their respective sports consistent with sound traditions of these sports and of such character as to ensure good sportsmanship and safe participation by the competitors." Members and chairs of the committees are elected at the NCAA's annual convention.

The NCAA's response to the current rash of CTE diagnoses in (deceased) football players has been different. The NCAA has denied that it has any ability to act to reduce repeated head hits, a major underlying cause of CTE. Both in the press and in this case, the NCAA has questioned the very existence of CTE, suggesting that the protein levels used to identify CTE were the result of age, genetics, sleep apnea or the use of certain drugs. The NCAA also claims that the link between subconcussive hits and CTE is unproven.

## CASE BACKGROUND

As stated, the NCAA denies the existence of CTE. In this case, it relies in large part on the testimony of Dr. Douglas Wiebe, a professor of epidemiology with a specialty in sports concussion. In his view, the weight of scientific evidence does not "establish" that repetitive head injury or concussion from football causes CTE. Essentially, Dr. Wiebe criticized the methodology of

5

the studies showing a link between repetitive head trauma and CTE.

The NCAA also relies on an article in the British Journal of Sports Medicine entitled "Consensus statement on concussion in sport," the purpose of which was to "develop further conceptual understanding of sport-related concussion (SRC)." (McCrory et al., *Consensus statement on concussion in sport—the 5th international conference on concussion in sport held in Berlin, October 2016* <https://bjsm.bmj.com/content/bjsports/51/11/838.\full.pdf> [as of Dec. 23, 2024], p. 1, archived at <https://perma.cc/E7VK-A59S>.) The NCAA relies on a brief statement that "A cause-and-effect relationship has not yet been demonstrated between CTE and SRCs or exposure to contact sports. As such, the notion that repeated concussion or subconcussive impacts cause CTE remains unknown." (*Id.* at p. 7, italics omitted.)

Alana Gee contends there is a causal link between repeated impacts to the head and CTE. The Centers for Disease Control and Prevention (CDC) has stated that CTE is "a progressive neurodegenerative disease caused in part by repetitive head trauma." The National Institute of Neurological Disorders and Stroke (part of the NIH) stated that CTE is "a progressive neurodegenerative disease caused by repetitive traumatic brain injury." Alana Gee's expert Dr. Bennet Omalu testified there was a general consensus in the medical literature that repetitive head trauma can cause CTE. He estimated that over a thousand peer-reviewed medical articles had been published linking repetitive head trauma and CTE. He was unaware of any reputable medical societies disavowing the link. Dr. Stein also testified there was no "real doubt left in science" that repetitive head

6

impacts cause CTE. A 2022 article in the journal Frontiers in Neurology looked at "six well-conducted case-control studies where the researchers made a reasonable attempt to identify RHI [repetitive head impacts] history and had more than 50 subjects to be sufficiently powered for statistical significance." "The clear and unremitting message from these studies is that the associations between RHI (and reliable proxies for it) and CTE cases are strong: consistently above the 2.0 benchmark" which indicates "it is more likely than not that any individual person with the exposure and the disease will have contracted the disease *because of the exposure* than for any other reason."

Currently, CTE can only be diagnosed formally after an individual dies, via an autopsy or brain dissection. Symptoms of the disease do not manifest for years or even decades after a player stops playing.[2]

Alana Gee also presented evidence that "CTE is directly proportional to the total number of hits you take to the head. And to the extent you substantially reduce the number of hits you take to the head, including concussions, but not limited to concussions, you would reduce your risk for CTE." The evidence

---

[2] The jury did not reach the issue of whether CTE was a substantial factor in Matthew Gee's death. It is undisputed that the immediate cause of his death was an alcohol and cocaine overdose. Alana Gee presented evidence that CTE causes mood and behavioral disorders, including substance abuse, and so was a substantial factor in Matthew Gee's death. The NCAA disputed this evidence and presented evidence that Matthew Gee's substance abuse problems predated his CTE and began in response to pain caused by congenital vascular insufficiency that caused painful swelling in his legs and feet.

showed that Matthew Gee likely sustained 4,000 to 6,000 hits to the head during his college career.

Alana Gee alleged the NCAA knew or should have known of the dangers of repeated head impacts well before Matthew Gee began his college football career. She presented the testimony of one historian and two medical doctors that the risks of repetitive head trauma and neurodegenerative disease were knowable to the NCAA before 1988. Her expert on medical history testified that the terms "chronic traumatic encephalopathy" or "traumatic encephalopathy" appeared in medical literature as early as 1940 and 1949. The NCAA pointed out that CTE research did not exist until 2002 at the earliest, and there was no case study on CTE in a football player until 2005. The trial court found near the end of the trial that, at the time Matthew Gee played football, "in the medical community in the United States, probably in the world, [CTE] was just not on anybody's radar screen." The court continued: '[W]e know that you can get serious or life-altering or life-ending head injuries because that has happened."

Alana Gee acknowledged that repeated head hits were an inherent risk of playing college football. Her theory at trial was that from 1988 to 1992 the NCAA should have taken reasonable steps to reduce the number of head impacts to college football players without changing the essential nature of the game, thereby reducing their risk of contracting CTE. She described seven such steps: "share medical literature about repetitive head injuries and neurodegenerative disease when they knew it"; "educate players about the true nature of Grade 1 concussions"; "educate coaches and players about the dangers of leading with their head"; "make playing rules that would have reduced head impact"; "enforce the existing rules"; "implement return-to-play

8

guidelines"; and "limit the number of full contact practices." Alana Gee argued that failing to take these measures unreasonably increased the risk to Matthew Gee over the inherent risks in football and there were measures that would have minimized the risk to her husband without altering the nature of football.

The NCAA contends it presented evidence showing it had addressed all seven of the actions proposed by Alana Gee and had done so when Matthew Gee was playing. The NCAA contended it provided information on head injuries (including concussions) to school-retained doctors and trainers, and warned of the dangers of leading with the head and using helmets to block or tackle, but offered that it was not the standard of care in the medical community to warn football players about CTE before 2005. Put differently, the NCAA did not provide information on CTE. The NCAA argued it could not force its members to enact additional rules and had no authority to enforce existing rules (which did prohibit some forms of a player's use of his helmet to block or tackle an opposing player). The NCAA noted no other sport had mandatory return-to-play guidelines when Matthew Gee played, but also pointed out USC had developed a return-to-play concussion protocol when Matthew Gee was playing. Finally, the NCAA claimed its members had limited contact practices by prohibiting contact practices during the first three days of the preseason practice period. These measures were undertaken no later than 1989, and primarily in response to the dangers of concussions. It is undisputed that concussions are only tangentially related to CTE.

On appeal, Alana Gee focuses on three of the steps she proposes the NCAA should have taken from 1988 to 1992. She

offered evidence that 60 percent of hits to the head occur in practice and that limiting the number of contact practices would decrease the number of head hits. She contends she presented evidence of two additional measures which she believed the NCAA should have taken to reduce the number of head impacts: establishing and enforcing stronger anti-spearing rules, and educating players on the risks of head injury so that players would know that "every time you can, keep your head out of the hit."

As we discuss in more detail below, it is undisputed that getting hit in the head is an inherent risk of college football. So under the assumption of risk doctrine, the NCAA's only duty was not to increase that risk. Because Alana Gee contends in part that CTE is an extrinsic risk of college football, we consider the parties' arguments concerning measures taken and not taken, but there is no duty to mitigate the inherent risks of a sport.

The trial court instructed the jury on the assumption of the risk doctrine using a modified form of CACI No. 472, which told the jury: "Alana Gee claims Matthew Gee was harmed while playing NCAA college football. To establish this claim, Alana Gee must prove the following: [¶] 1. That the NCAA either: [¶] (a) unreasonably increased the risks to Matthew Gee over and above those inherent in college football from 1988 to 1992, [¶] *or* [¶] (b) unreasonably failed to take a measure which would have minimized the risks to Matthew Gee without altering the essential nature of the sport. [¶] 2. That the NCAA's conduct was a substantial factor in causing Matthew Gee's harm."

These requirements were echoed on the special verdict form. The jury answered "No" to the following questions:

10

"1. Did the NCAA do something or fail to do something that unreasonably increased the risks to Matthew Gee over and above those inherent in college football?"

"2. Did the NCAA unreasonably fail to take a measure that would have [minimized] the risks to Matthew Gee without altering the essential nature of college football?"

The court entered judgment on the special verdict form and this appeal followed.

## DISCUSSION

The modern version of the assumption of the risk doctrine was set forth by the Supreme Court in *Knight*: "As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. (See Civ. Code, § 1714.) Thus, for example, a property owner ordinarily is required to use due care to eliminate dangerous conditions on his or her property. (See, e.g., *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. Thus, although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. (See generally Annot. (1987) 55 A.L.R.4th 632.) In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant." (*Knight, supra*, 3 Cal.4th at p. 315.)

"Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do

11

have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.  Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm.  The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant.  (See generally Annot. (1979) 95 A.L.R.3d 203.)" (*Knight*, *supra*, 3 Cal.4th at pp. 315–316.)

"As already noted, the nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself.  Additionally, the scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." (*Knight*, *supra*, 3 Cal.4th at p. 317.)  All defendants have a duty not to increase the inherent risk of a sport.  (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004.)  Generally, coparticipants and coaches/instructors have a duty to participants to not intentionally harm them and not to engage in conduct outside the range of ordinary activity for the sport.  (*Id*. at pp. 1004–1006.) "[A] stadium owner, because of his or her different relationship to the sport, may have a duty to take reasonable measures to protect *spectators* from carelessly thrown bats.  For the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport." (*Id*. at p. 1004, italics added.)

A.     ***The Assumption of the Risk Doctrine Applies.***

Alana Gee contends the trial court should not have given any jury instruction on assumption of the risk because the doctrine did not apply at all.  Alana Gee contends that the term

12

"risk" as used in the assumption of the risk doctrine either refers to the risk of a specific injury or includes specific injuries. According to Alana Gee, in order for the assumption of risk doctrine to apply in this case, the trial court in this case was required to find that CTE was an inherent risk of college football. In Alana Gee's view, the trial court is limited to deciding whether the "particular risk" of which the plaintiff complains is inherent or extrinsic. Because the trial court was "unwilling" to find CTE was an inherent risk, she contends the trial court erred in instructing the jury on assumption of risk.

Alana Gee characterizes CTE as an "extrinsic" risk of college football, and so subject only to the ordinary duty of care. She contends she offered evidence of steps which would have reduced the risk of CTE without altering the essential nature of the sport. To a large extent, Alana Gee's claim of error is just a restatement of her claim concerning inherent risk, to wit, the trial court should not have instructed the jury on the assumption of risk doctrine at all.

Alana Gee also complains of error in the instruction as given. She contends that because the court had decided to instruct on the assumption of risk doctrine, the court should have identified the inherent risk, which it found to be repeated head hits, and should have defined the "essential nature of the sport." It is not entirely clear what definition she proposes.

The trial court did not err in finding that the assumption of risk applied because Matthew Gee's injury was caused by an inherent risk of college football: repeated head hits.

Assuming the trial court erred in the way it instructed the jury on "extrinsic" risk, we see no prejudice to Alana Gee from this error.

We review claims of instructional error de novo.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.)  "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'  [Citation.] . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' "  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).)

       1.     *A Specific Injury Is Not an Inherent Risk of a Sport.*

Alana Gee contends that for the assumption of the risk doctrine to apply, the court had to find that Matthew Gee's specific injury, CTE, was an inherent risk of college football.  As she notes, the trial court was "unwilling" to make such a finding.

In finding that the assumption of the risk doctrine applied, the trial court ruled: "Plaintiff wants to define the 'risk' to be assumed as 'the risk of contracting CTE.'  But a pathological definition of the risk to be assumed makes little sense . . . . The risk athletes assume is the risk of a physical event; the precise nature of the subsequent pathological consequences is not something that can or need be predicted. . . . [¶] It cannot reasonably be disputed that blows to the head are an inherent risk of college football.  [Fn. omitted.]"  This is a correct statement of the law.

As formulated in *Knight*, the term risk does not refer to a specific injury.  As the Court explained in that case: "In the sports setting, . . . *conditions or conduct* that otherwise might be viewed as dangerous often are an integral part of the sport itself.  Thus, although moguls on a ski run pose a *risk of harm* to skiers that might not exist were these configurations removed, the

14

challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. (See generally Annot. (1987) 55 A.L.R.4th 632.) In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant." (*Knight*, *supra*, 3 Cal.4th at p. 315, italics added.) There is nothing in this discussion to suggest that the application of the doctrine turns on whether a specific injury is an "integral part of the sport itself." The Court referred to dangerous "conditions or conduct" that pose a "risk of harm" to a plaintiff. The Court did not identify a specific injury that could occur from skiing moguls, let alone suggest that a defendant must show that a plaintiff's individual injury was an inherent risk of skiing.

Although the Court in *Knight* relied on the sport of skiing for much of its explanation of the doctrine, the case before the *Knight* Court actually involved the sport of touch football. The Court's discussion of the plaintiff's injury underscores the unimportance of a specific injury in the doctrine. In *Knight*, a coparticipant in a touch football game knocked the plaintiff down and stepped on her hand, causing an injury to her finger that eventually required amputation. This would certainly seem to be an unusual injury for that sport, but the Court mentioned the injury only in passing, and did not consider it in analyzing the plaintiff's claim. Rather, the Court focused on the co-participant's conduct to determine whether the co-participant was entitled to the protection of the assumption of the risk doctrine. (*Knight*, *supra*, 3 Cal.4th at pp. 320–321.)

"Accordingly, we conclude that a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to

financial liability—only if the participant *intentionally injures* another player or *engages in conduct that is so reckless* as to be totally outside the range of the ordinary activity involved in the sport." (*Knight*, *supra*, 3 Cal.4th at p. 320.)  The Court continued this framing when it analyzed the evidence in the case: "As applied to the present case, . . . [a]lthough plaintiff maintains that defendant's rough play . . . properly can be characterized as 'reckless,' the conduct alleged in those declarations is not even closely comparable to the kind of conduct—conduct so reckless as to be totally outside the range of the ordinary activity involved in the sport—that is a prerequisite to the imposition of legal liability upon a participant in such a sport." (*Id.* at pp. 320–321.)

Alana Gee contends the *Knight* Court did not make a distinction between conduct and injury in deciding risk because the Court used the phrase "knocking over plaintiff, stepping on her hand, and injuring her finger" to refer to the inherent risk of playing touch football.  We do not agree that the *Knight* Court was using this phrase to describe the plaintiff's specific injury as part of the inherent risk of football.  The Court was simply summarizing the evidence concerning the defendant's conduct: "The declarations filed in support of and in opposition to the summary judgment motion establish that defendant was, at most, careless or negligent in knocking over plaintiff, stepping on her hand, and injuring her finger." (*Knight*, *supra*, 3 Cal.4th at p. 320.)

The Supreme Court's later summary of *Knight* in another case makes it clear that it is the underlying conduct or condition which is an inherent risk, not the injury which results from the conduct or condition: "Applied in the sporting context, [the doctrine] precludes liability for *injuries arising from those risks*

16

*deemed inherent in a sport*; as a matter of law, others have no legal duty to eliminate those risks or otherwise protect a sports participant from them." (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161, italics added (*Avila*).)

Put differently, the assumption of the risk doctrine will apply only if the plaintiff was injured by an inherent risk of the sport. Knowing that a skier suffered a broken leg from a fall while skiing is not sufficient to determine whether the doctrine applies. If the skier broke his or her leg in a fall while skiing moguls, the injury was caused by a risk inherent in the sport and the doctrine applies; if the skier broke his or her leg due to a poorly maintained towrope, the doctrine does not apply. Thus, it is not the specific injury which is determinative, it is the nature of the conduct or condition which caused it.

Alana Gee maintains subsequent cases show a specific injury can be an inherent risk of a sport, if that is the "particular risk" of which a plaintiff complains. She relies on three cases to support her argument that a specific injury can be a form of risk like conduct or conditions: *Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11 (*Hass*); *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173 (*Saffro*); and *Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746 (*Wattenbarger*). While there is language in all three cases which refer to the plaintiff's injury as an inherent risk (*Wattenbarger*, *Hass*) or a risk (*Saffro*) of the sport, none of these cases hold, or even suggest, that the trial court must find that a specific injury is a risk of the sport in order for the assumption of the risk doctrine to apply; they do not analyze whether a specific injury may be an inherent risk of a sport. In addition, the facts of these three cases are unusual, making them cumbersome at best to apply more broadly.

17

*Hass* and *Wattenbarger* are dual injury cases, and the initial injury was caused solely by the strain the plaintiff placed on his own body while participating in a sport. Any discussion of the initial injury as an inherent risk of a sport is dicta, and in any event best understood as a shorthand for the risk being caused by the strain which is an inherent risk of pitching or running a marathon. The courts in both cases were concerned with the role of the defendants' conduct in causing the second injury, not the specific nature of that injury.

In *Wattenbarger*, the court recognized that "[w]hatever injury occurred on the third pitch was an inherent risk of the pitcher's unremitting contest with the batter." (*Wattenbarger*, *supra*, 28 Cal.App.4th at p. 753, italics added [third pitch caused the initial injury].) We do not see how this assists Alana Gee, as it indicates the specific nature of the injury is not significant, but the underlying conduct is. Further, the issue before the court was the defendant's conduct in allowing the plaintiff to continue pitching after he was injured, which caused the second injury. (*Id.* at p. 756.)

In *Hass*, the court noted that "both parties acknowledge that cardiac arrest is an inherent risk of the sport of long-distance running." (*Hass*, *supra*, 26 Cal.App.5th at p. 38.)[3] The court did not expressly discuss a causal link between conduct and the injury, but the court implicitly acknowledged that cardiac arrest was caused by the strain placed on the body by the

---

[3]     The assumption of the risk analysis in *Hass* is preceded by an extensive discussion of "inherent risk" in connection with the court's analysis of a release and waiver signed by the decedent which referred to " 'the inherent dangers and risks' " arising from participation in the race. (*Hass*, *supra*, 26 Cal.App.5th at p. 19.)

18

demands of the timed long-distance race, and that this unremitting strain was an inherent risk of such races. (*Hass*, at p. 38 [noting that "requiring runners to slow down or take breaks" would decrease the risk of cardiac arrest, but "the operator or organizer of a recreational activity has no duty to decrease risks *inherent* to the sport"].) The issue before the court was the defendant's conduct in failing to provide promised emergency medical personnel. (*Id.* at pp. 40–41.)

*Saffro* involves an even more unusual set of facts. Saffro, a long-distance runner, was diagnosed with severe hyponatremia, which is a decreased concentration of sodium in the blood; the hyponatremia resulted in pulmonary and cerebral edemas (*Saffro*, *supra*, 98 Cal.App.4th at p. 176.) Hyponatremia itself results from dehydration.[4] The Court of Appeal referred to both dehydration and hyponatremia as "risks" without further elaboration. (*Saffro*, at p. 179.) Given the complicated causation chain, it is not clear whether the court viewed dehydration as an injury resulting from long-distance running, or the cause of an injury (hyponatremia). We think dehydration is closer to the muscle strain in *Wattenbarger* and the heart stress in *Hass* than to the resulting tissue injury in *Wattenbarger* and cardiac arrest

---

[4] Because Alana Gee cites *Saffro* for the proposition that dehydration is an inherent risk of long-distance running, we note the trial court ruled only that "hyponatremia is an inherent risk of running a marathon." (*Saffro*, *supra*, 98 Cal.App.4th at pp. 177–178.) The Court of Appeal treated hyponatremia (and dehydration) as an extrinsic risk. (*Id.* at p. 179 [race organizer had "obligation to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids"].)

in *Hass*. Dehydration occurs when a person fails to replace fluids that his or her body has lost. In marathons, the strain of running causes the fluid loss. Nothing about the sport of running itself causes the runner to not replace those fluids.[5] Thus, in *Saffro*, the issue was whether the defendant's conduct caused the runner to be unable to replace needed fluids, specifically whether the defendant failed to provide the promised and customary fluids.

Nothing about these three cases undermines our earlier point: an injury sustained while participating in a sport may be caused by conduct or a condition which is inherent in the sport or by conduct or a condition which is not inherent in the sport. Looking at the injury does not reveal the nature of the risk which caused it. A defendant's liability is determined by the conduct or condition which caused the injury. In *Wattenbarger*, *Hass* and *Saffro*, the defendants' liability, if any, turned on the defendants' conduct, not the specific nature of the injury.

Here, it is undisputed that the conduct which causes CTE is repeated head hits, and head hits are an inherent risk of college football. The trial court did not err in finding that the assumption of risk doctrine applied.

---

[5] A runner could carry water with him, arrange for a friend to meet him along his route, plan his route to pass water fountains, or pre-position water bottles along his planned route.

In some cases, a participant in a sport may not have full autonomy to provide his or her own fluids, or to access available fluids. This situation raises a different question about causation.

### 2. *Alana Gee Shows No Prejudice From the Modified Version of CACI No. 472.*

The trial court, at Alana Gee's request, gave a modified version of CACI No. 472, which instructs the jury on the assumption of the risk doctrine as applied to facilities owners/operators and event sponsors/organizers.

Her proposed instruction reflects a misunderstanding of the assumption of the risk doctrine as applied to plaintiffs who are participants in the sport. A defendant "ha[s] no legal duty to eliminate (or protect a [participant] plaintiff against) risks inherent in the sport itself, [but] it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight*, *supra*, 3 Cal.4th at pp. 315–316.) Put differently, there is no duty to reduce an inherent risk.

Having obtained the instruction she wanted, Alana Gee now complains that the trial court should have defined the "essential nature" of the sport and not left it up to the jury. Alana Gee, however, does not explain how that omission could have prejudiced her. She has acknowledged that repeated head hits are an inherent risk of football. As she elaborates in her appellate briefing: "College football is a contact sport where blocking and tackling—and the resulting hits to the head—are essential elements of play. Removing those elements would fundamentally change the game, turning college football into something akin to flag football." Based on her arguments as a whole, Alana Gee may have wanted an instruction that CTE is not part of the essential nature of college football, or that repeated hits to the head were an essential part of college football. Alana Gee, however, was not entitled to an instruction

21

on extrinsic risk at all, and so any ambiguity could not have prejudiced her.

3.    *CTE Is Not an Extrinsic Risk of College Football.*

Alana Gee makes two arguments about extrinsic risk, for purposes of which she assumes for the sake of argument that head hits are an inherent risk of college football.  First, she contends that CTE itself can be mitigated without changing the essential nature of college football, and so it should be treated as an extrinsic risk.[6]  Second, Alana Gee contends that Matthew

---

[6]    Alana Gee's argument that extrinsic risks are those risks which can be mitigated without altering the essential nature of the sport represents a shift from her argument in the trial court. As discussed above, she argued in the trial court that the duty to mitigate applied to *inherent* risks of the sport.  She did not argue, as she appears to do on appeal, that there is a separate category of risk that is defined by the risk's ability to be reduced without altering the essential nature of the sport.

In making this new argument on appeal, Alana Gee does not mention *Kahn*, upon which the trial court relied, and does not directly discuss the role of the NCAA in the sport or Matthew Gee's role as a participant in the sport.  She relies on the use note to CACI No. 472, which states: "There is also a duty to minimize risks that are extrinsic to the nature of the sport; that is, those that can be addressed without altering the essential nature of the activity.  (*Hass*[, *supra*, 26 Cal.App.5th at p. 38].)"  The court in *Hass* did not define extrinsic risks as those risks which can be addressed without altering the essential nature of the sport. Rather the *Hass* court, referred to "the ordinary duty of due care with respect to the *extrinsic* risks of the activity, which should reasonably be minimized to the extent possible without altering the nature of the activity." (*Hass*, at p. 38.)  Put differently, this is a statement that if a risk is extrinsic, then the defendant had a

22

Gee's CTE was not caused by those head hits but by one or more extrinsic risks of the sport: being encouraged to continue to play after he was injured and/or not being warned of the risk of CTE, which is not an inherent risk of a sport. These arguments fail because there is no evidence to support the necessary factual predicates for them.

a. *CTE and the Inherent Risk of Repeated Head Hits Are Inextricably Intertwined.*

Alana Gee's first argument is premised on her belief that a specific injury can be a risk within the meaning of the assumption of the risk doctrine. As we have explained above, it cannot. Risk refers to conduct or a condition of the sport, not the specific injury which results from that conduct or condition. The term "extrinsic risk" thus refers to conduct or a condition which is not an inherent risk of the sport. For example, the lack of medical personnel in *Hass* and the lack of fluids in *Saffro* are examples of extrinsic risks of the sport of long-distance running. Because we reject Alana Gee's premise that CTE is an extrinsic risk of college football, we need not and do not consider her claims that the risk could be reduced.

We briefly consider her claims that CTE was not caused by head hits, but by the NCAA's decision to have injured players continue to play and/or by its failure to warn of CTE. We find them to have no merit under facts of this case, which took place from 1988 to 1992.

---

limited duty to minimize it. The Judicial Council did not use the language of *Hass* (or the use note's summary of *Hass*'s holding) in the standard instruction.

Alana Gee's theory of the case was that CTE was a direct result of repeated head hits, and her plan for reducing CTE is to reduce the number (and possibly type) of hits a football player sustains. But Alana Gee has repeatedly acknowledged that blocking and tackling are an essential part of the sport of college football and repeated head hits, which result from blocking and tackling, are an inherent risk of the sport. Thus, by definition, repeated head hits cannot be minimized without changing the game of college football. Nothing precludes the NCAA from changing the game of college football to eliminate the inherent risk of head hits. The assumption of the risk doctrine precludes us from doing so.

However, Alana Gee contends that the number of hits could have been reduced in 1988 by reducing the number of contact practices a team holds; she contends 60 percent of hits occur during such practices. But from 1988 to 1992, there is no evidence in the record that the NCAA knew that reducing full-contact practices would have led to a reduction in players contracting CTE.

In support of her argument that practices can be changed without changing the sport, Alana Gee argues that the NFL has changed its practice rules without changing the game of football. The record shows that the NFL has limited contact practices to some extent. We see nothing in the record, however, suggesting that NFL teams were limiting contact practices during the period that Matthew Gee played for USC.

In addition to reducing the number of contact practices, Alana Gee makes two suggestions for reducing the risk of CTE: establishing and enforcing stronger anti-spearing rules, and educating players on the risks of head injury so that players use

24

more arm and shoulder tackles rather than leading with their head.  Both are attempts to reduce the number of head hits a player experiences and have the potential to change the nature of the sport.  They suffer a further flaw—unlike practice restrictions, there is no indication that during the era that Matthew Gee played, these measures would actually reduce head hits sufficiently to reduce the incidences of CTE.

NCAA rules categorically prohibited spearing when Matthew Gee was playing for USC and provided a substantial penalty for such conduct.  There is nothing in the record to indicate how often spearing occurred, or how often the anti-spearing rule was not enforced.  College football players (at least those in Matthew Gee's position), receive a thousand or more hits per season.  Without such basic information, it is not possible to find that better enforcement would have reduced the risk of CTE.

When Matthew Gee played for USC, players were barred from intentionally using their helmets to "ram" an opposing player and from intentionally using the crown or top of their helmets to "strike" a runner, and the rules provided a substantial penalty for violations.  Game penalties were provided for violation of these rules.  There is nothing in the record to show how often permitted contact with the helmet occurred, or how feasible it would be for a player to choose not to lead with his helmet in the heat of a play, that is, to prevent "unintentional" contact with the helmet.  There is no basis to conclude that education would have significantly reduced the number of head hits, and so reduced the incidence of CTE.

We emphasize that this is not a finding that rules changes and education are ineffective.  It is simply a finding that there is

insufficient evidence in the record before us to prove that they would be effective.

b.  *Allowing Apparently Healthy Players to Continue Playing is Not the Equivalent of Allowing an Injured Player to Return to Play.*

Alana Gee relies on *Wattenbarger* and a federal case, *Mayall v. USA Water Polo, Inc.* (9th Cir. 2018) 909 F.3d 1055 (*Mayall*), to support her contention that CTE is caused by the extrinsic risk of continuing to play after an injury.

As we have discussed, the court in *Wattenbarger* found that the strain of throwing the ball was an inherent risk of baseball, and so the assumption of risk doctrine applied to the plaintiff's initial injury on the third pitch. But, as the court noted, "the incident did not end with the third pitch. Viewed in the light most favorable to plaintiffs, the evidence establishes defendants . . . permitted him to continue after he informed them his arm had 'popped.' It is reasonable to infer that when plaintiff, a 17-year-old, informed the Reds' personnel his arm had 'popped,' he was seeking guidance as to how to proceed. Hearing nothing to countermand the original instruction to pitch, and obviously anxious to please and impress the scouts, plaintiff threw another pitch, thereby causing further injury." (*Wattenbarger, supra,* 28 Cal.App.4th at pp. 753–754, fn. omitted.) The court concluded "defendants owed a duty of care to protect participants from aggravating injuries during the tryout. This would include preexisting injuries known to defendants as well as those occurring during the tryout. Thus, primary assumption of risk is

26

inapplicable." (*Id.* at p. 756.)[7]  *Mayall* involved a very similar sequence of events, although the sport was water polo and the injury a concussion.  The court in *Mayall* largely relied on the analysis in *Wattenbarger*, and we do not discuss it further. (*Mayall*, *supra*, 909 F.3d at p. 1063 ["the case before us is remarkably similar to" *Wattenbarger*].)

In her reply brief, Alana Gee contends that the cases stand for the proposition that "the fact that an injury is the result of repeated exposure to inherent risks of a sport does not make the cumulative injury itself an inherent risk of the sport."  This phrasing reverts to her flawed characterization of specific injuries as a risk of a sport.

We do not agree that repeated exposure to conduct or a condition is fundamentally different than a one-time exposure to conduct or a condition.[8]  Many sports cause injuries to participants as the result of repeated exposure to conduct or a condition, specifically strain on a part of the body used heavily in the sport: tennis elbow and runner's knee are perhaps the most common.  It was the failure to provide guidance to the plaintiff

---

[7]     The *Wattenbarger* court also stated that the defendants "owed a duty to plaintiff and the other participants not to increase the risks inherent in the game of baseball." (*Wattenbarger*, *supra*, 28 Cal.App.4th at p. 755.)  This is a duty which would arise if the assumption of the risk doctrine applied.

[8]     Even taking Alana Gee's argument at face value, nothing in *Wattenbarger* or *Mayall* suggests that an injury which arises from repeated exposure to a cumulative risk is somehow different than an injury which results from a single exposure.  It is action or inaction after knowledge of the injury which triggers the duty of care in those cases.

when he or she sought it after being injured, resulting in the plaintiff returning to play, that took the subsequent injury outside the assumption of the risk doctrine in *Wattenbarger* and *Mayall*.

Specifically, the holding in *Wattenbarger* applies to an injury which occurs during gameplay and which is either apparent to team observers or which the player brings to the team's attention.[9] This creates a rule that a team has a duty not to aggravate a known injury to a specific player. Put differently, allowing an injured player to continue to play once an injury manifests itself is not an inherent risk of any sport. This rule does not assist Alana Gee.

Alana Gee does argue that the NCAA knew or should have known that repeated head hits caused CTE, although the NCAA disputes this. All college football players receive numerous head hits, but apparently not all develop CTE. A formal diagnosis is not possible until the player's brain can be examined after death. When Matthew Gee played, the NCAA did not know and could not have known which specific college football players had received sufficient hits to cause CTE, or when that threshold was reached. In Matthew Gee's case, most, if not all, of the symptoms associated with CTE did not develop until after he stopped playing. Thus, Matthew Gee was not in the same position as the athletes in *Wattenbarger* and *Mayall*.

---

[9] There is no indication that the plaintiff in *Wattenbarger* had any preexisting injury, and so the reference to duty concerning known preexisting injuries is dicta.

28

*The Duty to Warn Only Applies to Instances of Increased Risk, Which Were Not Present Here.*

Alana Gee also contends, somewhat perfunctorily, that Matthew Gee's CTE was caused by the NCAA's failure to warn of its risks; Alana Gee characterizes this as an extrinsic risk of the sport. She relies on *Lackner v. North* (2006) 135 Cal.App.4th 1188 to support this claim. The duty to warn discussed in *Lackner* applies to increased risks in a sport. There was no duty to warn in that case. As the court explained: "Because there is no evidence to show that allowing race participants access to ordinary runs *increased* the risk of injury on the slopes and that Mammoth was aware of such *increased* risks, it was under no obligation to warn its patrons that race participants had free access to all of the runs. (*Id.* at p. 1204, italics added.) The same is true of the two cases cited in *Lackner* concerning the duty to warn. (*Id.* at p. 1202.)[10]

Alana Gee has neither offered reasoned argument nor pointed to any evidence in the record which would show that the

---

[10] In *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, a ski resort created a temporary race course on one of its ordinary runs. After noting "a resort cannot increase the risks associated with skiing without incurring a duty of care toward its patrons," (*id.* at p. 364), the court held that "when a resort turns part of a previously ordinary run into a significantly more dangerous racing area, it has a duty to warn its patrons." (*Id.* at p. 366.) In *Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578, the court stated that a stable operator "owes the duty to warn the patrons renting a given horse if that horse has evidenced a predisposition to behave in ways which *add* to the ordinary risk of horse riding." (*Id.* at p. 587, italics added.)

NCAA had increased the risks associated with college football during the era Matthew Gee played at USC.

### 4. *Inherent Prejudice*

In addition to her specific claims of error, Alana Gee also makes a general claim that it was prejudicial per se to allow the jury to decide these legal questions: What are the inherent risks of college football? What is the essential nature of the sport? She is mistaken. "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission." (*Soule*, *supra*, 8 Cal.4th at p. 580.) Alana Gee must demonstrate prejudice to her and she has not.

### B. **CACI No. 3712**

Alana Gee contends the trial court erred in refusing to instruct the jury with a modified version of CACI No. 3712 which explains liability of a joint venture. As relevant on appeal, the requested modified first paragraph of the instruction would have read: "An unincorporated association is responsible for the wrongful conduct of a member acting in furtherance of the unincorporated association."[11]

The NCAA contends Alana Gee waived her claim that the trial court erred in refusing to give her a modified version of CACI No. 3712 because she has abandoned her original basis for

---

[11] It was undisputed the NCAA was an unincorporated association, and Alana Gee does not claim any prejudice from the omission of the remainder of the requested instruction, which concerned whether an unincorporated association had been formed.

30

requesting the instruction and is asserting a new basis on appeal. Assuming for the sake of argument that waiver could occur under such circumstances, we do not find waiver here.

Alana Gee filed an October 7, 2022 pretrial brief with the court on the NCAA's liability as an unincorporated association, which included a request for the modified version of CACI No. 3712. In that brief, she made a substantially similar argument to the one she makes in this appeal.

While the trial court and the NCAA are correct that an unincorporated association is a creature of statute, they overlook that those statutes essentially allow each association to set up its own system of management and governance. An unincorporated association is expressly permitted to create its own governing document and to state its own governing principles. (Corp. Code, §§ 18035, 18008, 18010.) It can define the term "member" as it wishes. (Corp. Code, § 18015, subd. (a).) It can give the members the right to make policy, which is generally viewed as a management function.[12] (*Id*. at subd. (b).)

---

[12] The Law Revision Commission comment to Corporations Code section 18015 provide that subdivision (b) of section 18015 is drawn from Section 1(1) of the Uniform Unincorporated Nonprofit Association Act (1996). (Cal. Law Revision Com. com., Deering's Ann. Corp. Code (2009 ed.) foll. § 18015, p. 3.) As one commentator on the Revised Uniform Unincorporated Nonprofit Association Act (2008) (RUUNAA) has noted: "The scope of the requirement that members determine the 'policy' of the association is unclear. Depending upon the meaning ascribed to 'policy,' setting policy is generally viewed as a management function, and the segregation of this function from the management responsibilities vested in managers under RUUNAA is not the subject of any explanation in the comments to the statute. In essence, the effect of vesting policy-making

31

We need not resolve the issue of the NCAA's liability for the inaction of its Football Rules Committee or of its members at the annual convention. The lack of a modified version of CACI No. 3712 could only prejudice Alana Gee if the members' actions or inactions increased the inherent risk of repeated head hits in college football.[13] On appeal, she does not even argue that there was such an increase. The failure to take action to reduce a risk does not increase the risk. (*Avila*, *supra*, 38 Cal.4th at p. 166 [providing umpires at a game might have reduced the risk of a "beanball" but the failure to do so did not increase the risk].)

---

authority in the members as a default rule may be that the members constitute a type of governing board while the managers essentially function as officers." (Miller, *Doctoring the Law of Nonprofit Associations with a Band-aid or a Body Cast: A Look at the 1996 and 2008 Uniform Unincorporated Nonprofit Association Acts* (2012) 38 William Mitchell L.Rev. 852, 881, fns. omitted.)

[13] As noted above, *Wattenbarger* could be characterized as stating that directing an athlete to continue playing while injured increases the inherent risks of the sport. Alana Gee did not rely on this aspect of *Wattenbarger*. More importantly, as we have explained above, Matthew Gee did not manifest symptoms which would have suggested CTE during his playing career and so *Wattenbarger* is factually inapplicable.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.


                                    STRATTON, P. J.


We concur:



WILEY, J.



VIRAMONTES, J.

33

Filed 1/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ALANA GEE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>NATIONAL COLLEGIATE<br>ATHLETIC ASSOCIATION,<br><br>     Defendant and Respondent. | B327691<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV43627)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

     The opinion in the above-entitled matter filed on December 24, 2024, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

     There is no change in the judgment.

_____

STRATTON, P. J.           WILEY, J.           VIRAMONTES, J.